No. 23-10837

# In the United States Court of Appeals
## for the Fifth Circuit

ETHAN MCROREY; KAYLEE FLORES; GUN OWNERS OF AMERICA, INCORPORATED; GUN OWNERS FOUNDATION,

*Plaintiffs-Appellants*,

v.

MERRICK GARLAND, U.S. ATTORNEY GENERAL; FEDERAL BUREAU OF INVESTIGATION,

*Defendants-Appellees*.

**Appeal from the United States District Court for the Northern District of Texas
United States District Court Judge Reed O'Connor, Civ. No. 7:23-cv-00047-O**

## PLAINTIFFS-APPELLANTS' OPENING BRIEF

Robert J. Olson
WILLIAM J. OLSON, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
(703) 356-5070
wjo@mindspring.com

Stephen D. Stamboulieh
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

Oliver M. Krawczyk
AMBLER LAW OFFICES, LLC
20 South Braddock Street
Winchester, VA 22601
(540) 550-4236
oliver@amblerlawoffices.com

*Attorneys for Appellants Ethan McRorey, Kaylee Flores, Gun Owners of America, Incorporated and Gun Owners Foundation*

No. 23-10837

# In the United States Court of Appeals
## for the Fifth Circuit

ETHAN MCROREY; KAYLEE FLORES; GUN OWNERS OF AMERICA, INCORPORATED; GUN OWNERS FOUNDATION,

*Plaintiffs-Appellants*,

v.

MERRICK GARLAND, U.S. ATTORNEY GENERAL; FEDERAL BUREAU OF INVESTIGATION,

*Defendants-Appellees*.

**Appeal from the United States District Court for the Northern District of Texas
United States District Court Judge Reed O'Connor, Civ. No. 7:23-cv-00047-O**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

i

**Plaintiffs-Appellants:**

Ethan McRorey; Kaylee Flores; Gun Owners of America, Inc.*;

Gun Owners Foundation*

**Counsel for Plaintiffs-Appellants:**

Robert J. Olson, William J. Olson, PC; Stephen D. Stamboulieh,

Stamboulieh Law, PLLC; David G. Brown, Spiro & Browne PLC;

Brandon W. Barnett, Barnett Howard & Williams PLLC; Oliver

M. Krawczyk, Ambler Law Offices, LLC

**Defendants-Appellees:**

Governmental parties are exempt from 5th Cir. R. 28.2.1.

**Counsel for Defendants-Appellees:**

Taisa M. Goodnature, Courtney Dixon, Steven H. Hazel, U.S.

Department of Justice, Civil Division

* Pursuant to Fed. R. App. P. 26.1(a) and 5th Cir. R. 28.2.1, Gun Owners
of America, Inc. and Gun Owners Foundation are non-stock, nonprofit
corporations with no parent companies.  Therefore, no publicly held
company owns 10% or more of their stock.

*/Stephen D. Stamboulieh*
Stephen D. Stamboulieh

ii

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants respectfully request oral argument. This case warrants oral argument in accordance with Fed. R. App. P. 34(a)(2) and 5th Cir. R. 28.2.3. First, this appeal is not frivolous; Plaintiffs-Appellants' arguments supporting their request for a preliminary injunction find support in the Supreme Court's express holdings, this Circuit's precedents, and a vast consensus of other federal courts that have considered the Second Amendment rights of young adults. Second, this Court has not authoritatively decided the dispositive issue in this case, but its prior decisions and the weight of federal authority support Plaintiffs-Appellants' arguments. Finally, because this case involves significant and novel questions about the constitutionality of a federal statute affecting millions of people, Plaintiffs-Appellants submit that oral argument would significantly aid this Court's decisional process.

# TABLE OF CONTENTS

*CERTIFICATE OF INTERESTED PERSONS* ....................................................... i

*STATEMENT REGARDING ORAL ARGUMENT* ........................................... iii

*TABLE OF CONTENTS* ................................................................. iv

*TABLE OF AUTHORITIES* .......................................................... vi

*JURISDICTION* ......................................................................... 1

*ISSUES PRESENTED* ................................................................ 1

*STATEMENT OF THE CASE* ....................................................... 1

*SUMMARY OF THE ARGUMENT* ............................................... 4

*STANDARD OF REVIEW* ............................................................ 8

*ARGUMENT* ............................................................................... 8

I.   The District Court Erred by Finding that Plaintiffs Are Not Likely to Succeed on the Merits of Their Second Amendment Claim. ............. 8

   a.   The District Court Correctly Concluded that 18-to-20-Year-Olds Are Part of "the People" Protected by the Second Amendment. ........ 8

   b.   The District Court Correctly Concluded that the Government Failed to Meet Its Burden to Demonstrate a Broad and Enduring Historical Tradition of Similar Regulation. ....................................... 20

   c.   The District Court Erred by Elevating Various Ambiguous and Inapposite Dicta Above *Bruen*'s Clear Instruction to Conduct a Historical Analysis in *Every* Case. ..................................................... 22

1. The Challenged Provisions Cannot Be Justified Based on Prohibitions that Apply to Felons and the Mentally Ill..............23

2. The Challenged Provisions Cannot Be Justified Based on Prohibitions that Apply to Felons and the Mentally Ill..............28

3. The Challenged Provisions Cannot Be Justified Based on "Shall-Issue" Concealed Carry Permitting Regimes...........................31

4. The *Bruen* Framework Must Be Faithfully Applied, Every Time, Without Exception.................................................................36

II.    Plaintiffs Have Suffered and Will Continue to Suffer Irreparable Harm Absent Preliminary Relief. ........................................................ 41

III.    The Balance of Equities Weighs Heavily in Plaintiffs' Favor.... 44

*CONCLUSION*.................................................................................... 46

*CERTIFICATE OF COMPLIANCE*.................................................48

*CERTIFICATE OF SERVICE*..........................................................  49

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*Anibowei v. Morgan*, 70 F.4th 898 (5th Cir. 2023) . . . . . . . . . . . . . . . 41

*Antonyuk v. Hochul*, No. 1:22-cv-00986, ECF #73
    (N.D.N.Y. Oct. 25, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

*Baird v. Bonta*, 2023 U.S. App. LEXIS 23760
    (9th Cir. Sept. 7, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Beeler v. Long*, No. 21-cv-152 (KAC/DCP), ECF #50
    (E.D. Tenn. Apr. 26, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11

*Bezet v. United States*, 714 F. App'x 336 (5th Cir. 2017) . . . . . . . . . . . 20

*Def. Distributed v. U.S. Dep't of State*, 865 F.3d 211
    (5th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Direct Biologics, L.L.C. v. McQueen*, 63 F.4th 1015
    (5th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*District of Columbia v. Heller*, 554 U.S. 570 (2008) . . . . . . . . . . . *passim*

*Elrod v. Burns*, 427 U.S. 347 (1976) . . . . . . . . . . . . . . . . . . . . . . . . 41

*Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020) . . . . . . 13, 37

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) . . . . . . . . . . . . . 20

*F.E.B. Corp. v. United States*, 818 F.3d 681 (11th Cir. 2016) . . . . . . . . 7

*Firearms Pol'y Coal., Inc. v. McCraw*,
    623 F. Supp. 3d 740 (N.D. Tex. 2022) . . . . . 9, 10, 14, 15, 16, 17, 34

*Fraser v. BATFE*, 2023 U.S. Dist. LEXIS 82432
    (E.D. Va. May 10, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Fraser v. BATFE*, 2023 U.S. Dist. LEXIS 154088
    (E.D. Va. Aug. 30, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Hirschfeld v. BATFE*, 5 F.4th 407
    (4th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . . . 11, 17, 21, 22, 24, 26, 30

*Hirschfeld v. BATFE*, 14 F.4th 322 (4th Cir. 2021) . . . . . . . . . . . . . . . 11

*Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992
    (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Horsley v. Trame*, 808 F.3d 1126 (7th Cir. 2015) . . . . . . . . . . . . . . . . . . 13

*Jackson Women's Health Org. v. Currier*, 760 F.3d 448
    (5th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

*Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) . . . . . . . . . . . . . . . . . . . 11, 17

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) . . . . . . . . . . . . . . . . . . 18, 24

*Koons v. Platkin*, 2023 U.S. Dist. LEXIS 85235
    (D.N.J. May 16, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33, 39

*Lara v. Evanchick*, 534 F. Supp. 3d 478 (E.D. Pa. 2021) . . . . . . . . . . . 13

*Maryland Shall Issue, Inc. v. Moore*, No. 21-2017
    (4th Cir. Mar. 10, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Missouri v. Biden*, 2023 U.S. App. LEXIS 26191
    (5th Cir. Oct. 3, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Nken v. Holder*, 556 U.S. 418 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*NRA v. BATFE*, 700 F.3d 185
    (5th Cir. 2012) . . . . . . . . . . . . . . 5, 12, 13, 14, 15, 16, 17, 18, 19, 20

*NRA v. BATFE*, 714 F.3d 334
    (5th Cir. 2013) . . . . . . . . . . . . . . . . 14, 15, 16, 17, 20, 22, 24, 25, 28

*NRA v. Bondi*, 2023 U.S. App. LEXIS 17960
(11th Cir. July 14, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*NRA v. McCraw*, 719 F.3d 338 (5th Cir. 2013) . . . . . . . . . . . . . . . 12, 13

*NRA v. Swearingen*, 545 F. Supp. 3d 1247 (N.D. Fla. 2021) . . . . . 10, 26

*Nunn v. State*, 1 Ga. 243 (1846) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111
(2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Opulent Life Church v. City of Holly Springs*, 697 F.3d 279
(5th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43, 46

*Range v. AG United States*, 69 F.4th 96 (3d Cir. 2023) . . . . . . . 18, 37, 38

*Reese v. BATFE*, 2022 U.S. Dist. LEXIS 230140
(W.D. La. Dec. 21, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Rhode v. Becerra*, 445 F. Supp. 3d 902 (S.D. Cal. 2020) . . . . . . . . . . . 35

*Rigby v. Jennings*, 630 F. Supp. 3d 602 (D. Del. 2022) . . . . . . . . . 29, 37

*Rocky Mountain Gun Owners v. Polis*,
2023 U.S. Dist. LEXIS 137087 (D. Colo. Aug. 7, 2023) . . 10, 26, 39

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) . . . . . . . . 20

*Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678
(6th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Bullock*, 2023 U.S. Dist. LEXIS 112397
(S.D. Miss. June 28, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023) . . . . . . . . . . 19, 24

*United States v. Guthery*, 2023 U.S. Dist. LEXIS 54072
(E.D. Cal. Mar. 28, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Hicks*, 2023 U.S. Dist. LEXIS 35485
(W.D. Tex. Jan. 9, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) . . . . . . . . . . 20

*United States v. Perez-Gallan*, 640 F. Supp. 3d 697
(W.D. Tex. 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .40

*United States v. Price*, 635 F. Supp. 3d 455 (S.D. W. Va. 2022) . . . 29, 30

*United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023) . . . . . . . . . . 18, 19

*United States v. Rene E.*, 583 F.3d 8 (1st Cir. 2009) . . . . . . . . . . . 12, 13

*United States v. Silvers*, 2023 U.S. Dist. LEXIS 77061
(W.D. Ky. May 3, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38, 39

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) . . . . . . . . . . . 8

*Worth v. Harrington*, 2023 U.S. Dist. LEXIS 56638
(D. Minn. Mar. 31, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Yukutake v. Conners*, 554 F. Supp. 3d 1074 (D. Haw. 2021) . . . . . . . 34

## Constitutions

U.S. Const. amend. II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

## Statutes

Cal. Penal Code § 30312 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 35

Bipartisan Safer Communities Act of 2022, Pub. L. No. 117-159,
136 Stat. 1313 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

N.Y. Penal Law § 400.03 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

18 U.S.C. § 922 . . . . . . . . . . . . . . . . . . . . . . . . . 1, 18, 19, 23, 29, 37, 38

28 U.S.C. § 1292(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

34 U.S.C. § 40901(*l*) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## Regulations

27 C.F.R. § 478.102(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## Miscellaneous Authorities

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane,
    Federal Practice and Procedure § 2948.1 (2d ed. 1995) . . . . . . . 43

*Constitutional Carry/Unrestricted/Permitless Carry*, USCCA
    (last visited Oct. 23, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Indefinite*, Merriam-Webster (last visited Oct. 19, 2023) . . . . . . . . . . 27

*Inmate Age*, Bureau of Prisons (Oct. 14, 2023) . . . . . . . . . . . . . . . . . 27

Michael Kan, *NY State Bill Would Require Background Checks
    to Buy 3D Printers*, PCMag (Oct. 16, 2023) . . . . . . . . . . . . . . . . 35

*Mild Cognitive Impairment (MCI)*, Mayo Clinic (Jan. 18, 2023) . . . . . 27

*Open Carry*, OpenCarry.org (last visited Oct. 23, 2023) . . . . . . . . . . . 32

*The Seven Stages of Dementia*, Dementia.org
    (last visited Oct. 19, 2023) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*USCCA's Concealed Carry Reciprocity Map & Gun Laws
    by State*, USCCA (last visited Oct. 23, 2023) . . . . . . . . . . . . . 33, 34

Webster's New World College Dictionary (4th ed. 2010) . . . . . . . . . . . 22

# JURISDICTION

The district court had jurisdiction pursuant to 28 U.S.C. § 1331. This Court has jurisdiction over this appeal from a denial of preliminary injunction under 28 U.S.C. § 1292(a)(1). Plaintiffs-Appellants' appeal was timely filed on August 14, 2023.

# ISSUES PRESENTED

1. Whether the district court erred in denying Plaintiffs-Appellants' Motion for a Preliminary Injunction.

# STATEMENT OF THE CASE

On November 14, 2022, a nationwide restriction on young adults' Second Amendment rights took effect, imposing an automatic and indefinite waiting period on prospective firearm purchases by those between the ages of 18 and 21. This so-called "enhanced background check" requirement, established by the so-called "Bipartisan Safer Communities Act," Pub. L. No. 117-159, 136 Stat. 1313, and codified at 18 U.S.C. § 922(t)(1)(C) and 34 U.S.C. § 40901(*l*) (the "Challenged Provisions"), mandates that all adults of lawful age – persons who have the capacity to contract, marry, assume debt, vote, join the military, and possess firearms generally – nonetheless are subject to unpredictable

1

delays each time they seek to exercise their right to acquire firearms by making purchases at federally licensed dealers.

The Challenged Provisions create a series of prerequisites for firearm transfers to 18-to-20-year-olds that cannot be met on the (purportedly) "instant" basis originally contemplated by the National Instant Criminal Background Check System ("NICS").  These provisions require "an affirmative inquiry … and receipt of a response from[] at least three separate state and local officials or agencies: (i) the state repository for juvenile justice records, (ii) a state repository for mental health records (to the extent a state even has such a central clearinghouse), and (iii) a [local chief law enforcement officer]."  ROA.16.  But while the Challenged Provisions require a determination by the FBI as to "whether" a young adult is eligible to purchase a firearm, local authorities are under no obligation to respond to such a NICS inquiry. *See* ROA.16-17.

Since an "instant" NICS response is no longer possible under the new regime, young adults are automatically placed into a "delayed" status that typically lasts *at least* three business days (often far longer), at which point the firearms dealer *may* exercise its discretion – often

contrary to store policy – to transfer the firearm without having received an "approved" response from the FBI.[1]  *See* ROA.17-18.  The cumulative effect of these statutory and practical delays is the inability of young adults to exercise their right to acquire a firearm at least for days – and possibly for weeks – by virtue of their age alone.[2]

Suffering constitutional harms individually, and representing thousands more similarly situated young adults, Plaintiffs-Appellants Ethan McRorey, Kaylee Flores, Gun Owners of America, Inc., and Gun Owners Foundation ("Plaintiffs") brought suit, seeking declaratory and injunctive relief to prevent the Second Amendment's backslide into second-class status and the relegation of young adult citizens to constitutional steerage.

On August 14, 2023, the district court denied preliminary relief. The district court agreed with Plaintiffs that 18-to-20-year-old adults are part of "the people" protected by the Second Amendment (ROA.301 n.17),

---

[1] Actual wait times often exceed this optimistic minimum.  *See* ROA.97 (18 days from purchase to approval); ROA.262 (7 days); ROA.264 (14+ days).

[2] Adding insult to injury, ATF regulations establish that a background check "may be relied upon by the licensee" for only "30 calendar days from the date that NICS was initially contacted."  27 C.F.R. § 478.102(c).  Young adults thus are often left in a time crunch, waiting for the FBI to "approve" their "delayed" background checks before the ATF considers them timed out, and they are forced to begin the process again.

and thus agreed that the Challenged Provisions are presumptively unconstitutional under *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022). The district court further acknowledged Defendants' failure to bear their historical burden to show a broad and enduring historical tradition of similar regulation. ROA.300. But instead of ruling for Plaintiffs, the district court relied on untested, ambiguous, and altogether inapposite dicta to conclude that Plaintiffs failed to show a likelihood of success on the merits. ROA.301. Plaintiffs timely appealed. ROA.304.

## SUMMARY OF THE ARGUMENT

The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." This absolutist language contains no qualification or limitation constraining which members of "the people" enjoy the pre-existing individual right to arms. Accordingly, the right presumptively belongs to "all Americans," presumptively protects "all instruments that constitute bearable arms," and presumptively covers all "lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 581, 582, 624 (2008).

4

Consistent with the Second Amendment's unqualified textual command, any regulation implicating the right to keep and bear arms must comport with the original public understanding of the text adopted by its Framers, as evidenced by our "Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126. In other words, the government must conclusively demonstrate that the Framers never considered certain persons, arms, or activities to be within the protections of the Second Amendment in the first place. Otherwise, that which the Second Amendment protects, it protects absolutely.

The district court correctly found that young adults are members of "the people," as our early American traditions never excluded 18-to-20-year-olds from firearm ownership or use. ROA.300, 301 n.17. Although *NRA v. BATFE*, 700 F.3d 185 (5th Cir. 2012), considered that young adults might not belong to "the people," it never actually reached that conclusion, much less by applying the sort of rigorous and exacting historical analysis that *Bruen* requires. Whatever dicta could be drawn from that case have been overruled by *Bruen*, its findings have been widely criticized by federal courts across the country, and its

methodology has been undermined by several of this Court's subsequent decisions.

The district court also correctly recognized that Defendants bore the burden of supporting the presumptively *un*constitutional Challenged Provisions by showing a broad and enduring Founding-era tradition of similar restrictions on young adults' rights to acquire firearms. And as the District court rightly acknowledged, Defendants utterly failed to meet their burden. ROA.300. At this point in its analysis, the district court should have granted Plaintiffs a preliminary injunction, based on Defendants' failure to measure up to *Bruen*'s stringent requirement.

Instead, the district court relied on nondelineated, speculative, and untested Supreme Court dicta to conclude that Plaintiffs failed to show a likelihood of success on the merits. <u>This was the district court's only</u> <u>error</u>. The inapposite dicta relied on by the district court pertain to: (i) the assumed constitutionality of restrictions on felons and the mentally ill (although Plaintiffs are neither); (ii) conditions and qualifications on the commercial *sale* of arms (a waiting period to *purchase* a firearm is not one of those); and (iii) various "shall-issue" concealed carry licensing regimes (which have no relation to the issue at bar). ROA.300, 301. To

be sure, "there is dicta, and then there is Supreme Court dicta,"[3] but even Supreme Court dicta cannot supplant that Court's express holding that *Bruen*'s rigorous textual and historical analysis is the "***only***" relevant framework – one that must be applied in *every* Second Amendment case.

Correctly applying *Bruen* here, there should be no question that Plaintiffs have demonstrated a substantial likelihood of success on the merits. While the district court made a methodological error concerning Plaintiffs' likelihood of success on the merits, its opinion otherwise established all ingredients necessary for this Court to make that finding and to reverse the denial of preliminary injunctive relief below. And because the district court found Plaintiffs' conduct to be presumptively protected under the Second Amendment, the Challenged Provisions' interference with this conduct necessarily constitutes irreparable constitutional harm. Finally, absent any prospect of concrete harm to Defendants or any public interest whatsoever in the continued infringement of constitutional rights, Plaintiffs have demonstrated a clear necessity for preliminary injunctive relief.

---

[3] *F.E.B. Corp. v. United States*, 818 F.3d 681, 690 n.10 (11th Cir. 2016).

## STANDARD OF REVIEW

On appeal, this Court reviews the grant or denial of injunctive relief on an abuse of discretion standard. *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985). If the district court "relies on clearly erroneous factual findings in deciding whether to grant a preliminary injunction or relies on erroneous conclusions of law," it abuses its discretion. *Direct Biologics, L.L.C. v. McQueen*, 63 F.4th 1015, 1020 (5th Cir. 2023) (citation omitted). Finally, "[c]onclusions of law are reviewed de novo." *Id.* The standard for a preliminary injunction requires Plaintiffs to "establish that [they are] likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## ARGUMENT

**I.    The District Court Erred by Finding that Plaintiffs Are Not Likely to Succeed on the Merits of Their Second Amendment Claim.**

**a. The District Court Correctly Concluded that 18-to-20-Year-Olds Are Part of "the People" Protected by the Second Amendment.**

The district court correctly found that Plaintiffs cleared *Bruen*'s initial hurdle, concluding that "Plaintiffs have sufficiently shown that their conduct is covered by the Second Amendment." *See* ROA.300; *Bruen*, 142 S. Ct. at 2134-35. Rejecting the government's attempts to muddy a uniform historical record of adults age 18-20 routinely possessing and using firearms without any special limitation or restriction, the court correctly concluded that it "appears Plaintiffs are within 'the people' envisioned by the Second Amendment." ROA.301 n.17 (citing *Firearms Pol'y Coal., Inc. v. McCraw*, 623 F. Supp. 3d 740, 748-51 (N.D. Tex. 2022)); *see also* ROA.23-24, 26, 35, 118, 124-25, 248-52 (Plaintiffs' allegations and briefing that 18-to-20-year-olds belong to "the people"); ROA.207-14 (Defendants' briefing to the contrary).

Indeed, the overwhelming weight of authority favors Plaintiffs' position that the Second Amendment applies to them. Consistent with an early American tradition that often *required* young adults to be armed (*see* ROA.125), numerous federal courts have noted a corresponding dearth of historical regulations *restricting* those very same young adults from firearm ownership, possession, or use, and thus have concluded that young adults unambiguously are protected by the Second Amendment.

*See, e.g.*, *McCraw*, 623 F. Supp. 3d at 750 ("[t]he historical record supports this understanding."); *Rocky Mountain Gun Owners v. Polis*, 2023 U.S. Dist. LEXIS 137087, at *27 (D. Colo. Aug. 7, 2023) (citation omitted) (beginning with the "assumption that every American is included" and "the Governor has not shown a 'historical tradition of firearm regulation' of 18-to-20 year olds during the founding era"); *NRA v. Swearingen*, 545 F. Supp. 3d 1247, 1256 (N.D. Fla. 2021) (pending appeal in *NRA v. Bondi*, 2023 U.S. App. LEXIS 17960 (11th Cir. July 14, 2023) (awaiting *en banc* review, thus vacating an earlier panel decision that misapplied *Bruen*, *see* ROA.128)) (citation omitted) ("this Court has found no case or article suggesting that, during the Founding Era, any law existed that imposed restrictions on 18-to-20-year-olds' ability to purchase firearms.... Given the amount of attention this issue has received, if such a law existed, someone surely would have identified it by now."); *Fraser v. BATFE*, 2023 U.S. Dist. LEXIS 82432, at *36 (E.D. Va. May 10, 2023) ("the Second Amendment's protections apply to 18-to-20-year-olds"); *Worth v. Harrington*, 2023 U.S. Dist. LEXIS 56638, at *21-22 (D. Minn. Mar. 31, 2023) ("the text of the Second Amendment includes within the right to keep and bear arms 18-to-20-year-olds"); *Beeler v.*

*Long*, No. 21-cv-152 (KAC/DCP), ECF #50 (E.D. Tenn. Apr. 26, 2023) (state conceding that its carry ban for 18-to-20-year-olds violated the Second Amendment); *Hirschfeld v. BATFE*, 5 F.4th 407, 410 (4th Cir. 2021) (vacated on mootness grounds by *Hirschfeld v. BATFE*, 14 F.4th 322 (4th Cir. 2021), after the plaintiffs turned 21) ("Our nation's most cherished constitutional rights vest no later than 18. And the Second Amendment's right to keep and bear arms is no different."); *Jones v. Bonta*, 34 F.4th 704 (9th Cir. 2022) (vacated and remanded to district court in light of *Bruen*) ("the Second Amendment protects the right of young adults to keep and bear arms, which includes the right to purchase them.").

Not only have many lower court opinions explicitly found 18-to-20-year-olds protected by the Second Amendment, but also the Supreme Court's decisions have implicitly (but clearly) made the same point. First, the Court in *Heller* stated its "strong presumption that the Second Amendment right is exercised individually and belongs to **all Americans**." 554 U.S. at 595 (emphasis added). Later, when discussing the scope of "[a] well regulated Militia," the Court referenced "the first militia Act" which had defined the militia to include "'each and every free

able-bodied white male citizen … who is or shall be **of the age of eighteen years**, and under the age of forty-five years."' *Id.* at 596 (emphasis added); *see also id.* at 612-13 (citing with approval *Nunn v. State*, 1 Ga. 243, 250 (1846) (opining that the right applies to "the whole people, old **and young**, men, women and boys, and not militia only....")). Fourteen years later, *Bruen* echoed *Heller*'s implicit recognition that the Second Amendment protects young adults, stating in no uncertain terms that "[i]t is undisputed that … two **ordinary, law-abiding, adult citizens** – are part of '**the people**' whom the Second Amendment protects." *Bruen*, 142 S. Ct. at 2134 (emphasis added). Similarly here, Plaintiffs are "two ordinary, law-abiding, adult citizens," together with organizations that represent thousands more. ROA.9, 10. There simply is no way to read around the Supreme Court's clear language to find that the Plaintiffs do not possess Second Amendment rights.

The only decision of which Plaintiffs are aware that offers a contrary historical analysis is this Court's pre-*Bruen* decision in *NRA v. BATFE*, 700 F.3d 185, 202 (5th Cir. 2012).[4] *See also NRA v. McCraw*,

---

[4] It appears that two other circuits and at least one district court, prior to *Bruen*, concluded that 18-to-20-year-old restrictions are constitutional. First, *United States v. Rene E.*, 583 F.3d 8, 12 (1st Cir. 2009), claimed to find a "longstanding

719 F.3d 338, 347 (5th Cir. 2013) (reaching the same decision "because we are bound by a prior panel opinion of this court"); *Reese v. BATFE*, 2022 U.S. Dist. LEXIS 230140, at *28 (W.D. La. Dec. 21, 2022) (noting that "the panel opinion in *NRA* [was] issued pre-*Bruen* and therefore did not employ *Bruen*'s exact approach," but opining that the analysis "satisfies the *Bruen* test" with little further analysis).

Eleven years ago in *NRA*, a panel of this Court "suggest[ed]" – but, importantly, *did not decide* – that 18-to-20-year-olds are not protected by the Second Amendment, stating only that it was "inclined" to make that finding. 700 F.3d at 204. Rather, the Court explicitly reported having

---

tradition of prohibiting juveniles from both receiving and possessing handguns," but did so by relying entirely on state and federal statutes adopted from 1858 through 1993. Yet under *Bruen*, reliance on 19th- and 20th-century restrictions cannot "provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S. Ct. at 2154 n.28. Indeed, without an underlying tradition of young-adult firearm restrictions at the Founding for these late-in-time "analogues" to confirm, they are irrelevant. *See id.* at 2137 (treating 19th-century evidence "as mere confirmation"); *see also Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2258-59 (2020) (rejecting novel Reconstruction-era laws from "more than 30 States" as failing to "establish an early American tradition").

Next, *Horsley v. Trame*, 808 F.3d 1126 (7th Cir. 2015), upheld a parental signature requirement, but did so entirely based on now-prohibited interest balancing, explaining that "[w]e need not decide today whether 18-, 19-, and 20-year-olds are within the scope of the Second Amendment." *Id.* at 1131.

Finally, a Pennsylvania district court concluded that various restrictions on 18-to-20-year-olds are constitutional, but largely without analysis, instead relying on an alleged "broad consensus" from other courts (many of which have been superseded or vacated and remanded for further consideration in light of *Bruen*). *Lara v. Evanchick*, 534 F. Supp. 3d 478, 486-89 (E.D. Pa. 2021).

"face[d] institutional challenges in conducting a definitive review of the relevant historical record," *id.*, and thus proceeded to an interest-balancing analysis leading to its ultimate holding. *Id.* at 205-11.

Below, the government acknowledged that *Bruen* implicitly overruled the latter portion of the *NRA* opinion which utilized interest balancing, but took the position that *NRA*'s initial discussion of the historical tradition survives. ROA.348:16-21, 349:3-9. The district court, however, questioned whether the *NRA* decision had **correctly** performed the "rigorous analysis" required by *Bruen*. ROA.349:1-2, 349:10-13, 350:11-17 (asking government counsel whether the *NRA* opinion cited any "individual statutes … from the 1791 era," and characterizing the *NRA* opinion as instead relying on what "the attitudes were" at the time by "cit[ing] to some law review articles … [d]oesn't it appear … that that's all they relied on?"); *see also NRA v. BATFE*, 714 F.3d 334, 336 (5th Cir. 2013) ("*NRA II*") (Jones, J., dissenting from denial of rehearing) (faulting *NRA* for having considered only "'Founding-Era Attitudes' and 19th century laws"); *McCraw*, 623 F. Supp. 3d at 751-52 (rejecting the government's argument that *NRA* survives and concluding that *NRA* is

not persuasive because it "considered only what (a portion of) the historical record revealed about general Founding-Era attitudes").

The district court was correct to question the historical analysis conducted in *NRA*, which is entirely insufficient under *Bruen*'s rigorous standard. For example, the *NRA* panel stated that its historical analysis was comparable to a ban on 18-to-20-year-old firearm acquisition only "[a]t a high level of generality." 700 F.3d at 203; *cf. Bruen*, 142 S. Ct. at 2134-38, 2132-33 (engaging in a rigorous textual analysis, articulating the primacy of Founding-era sources, identifying analytical tools for use in analogical reasoning, and engaging directly with the primary sources). As a practical matter, *NRA*'s conclusion – based on the quasi-historical sources it cited – is suspect at best. As Judge Jones explained in dissent from denial of rehearing *en banc* (joined by five other judges) in *NRA II*, "the implications of the decision – that a whole class of adult citizens, who are not as a class felons or mentally ill, can have its constitutional rights truncated because Congress considers the class 'irresponsible' – are far-reaching." 714 F.3d at 335 (Jones, J., dissenting). Judge Jones criticized the *NRA* panel's opinion for having "not take[n] seriously *Heller*'s methodology and reasoning," instead "resort[ing] to generalized

15

history" by elevating "'Founding-Era Attitudes'" and "19th and 20th Century laws" – which the panel seemingly admitted "cannot boast a precise founding-era analogue" (*NRA*, 700 F.3d at 196) – over the Second Amendment's text. *NRA II*, 714 F.3d at 336-37, 339. As Judge Jones explained, "these sources are not all equal," and the "relevant historical materials" are to be found in "sources contemporary to [the Second Amendment's] adoption," which "couldn't be clearer" that "the right to keep and bear arms belonged to citizens 18 to 20 years old at the crucial period of our nation's history." *Id.* at 338-39. Judge Jones' prescient dissent in *NRA II* thus mirrors the analysis later adopted by the Supreme Court in *Bruen*, in both form and function.

Picking up where Judge Jones' dissent in *NRA II* left off, Judge Pittman's analysis in *McCraw* offers additional reasons why the *NRA* panel opinion is deeply flawed. Echoing Judge Jones' concerns that *NRA* elevated contemporary statutes over the Second Amendment's text, Judge Pittman explained that "courts must start and end with the text." *McCraw*, 623 F. Supp. 3d at 752. First, he observed that the text of the Second Amendment "does not mention any sort of age restriction," which "is notable – when the Framers meant to impose age restrictions, they

16

did so expressly." *Id.* at 748; *see also Hirschfeld*, 5 F.4th at 421. Second, Judge Pittman continued that "[o]ther constitutional provisions bolster this Court's interpretation." 623 F. Supp. 3d at 748-49; *see also Heller*, 554 U.S. at 580 ("in all six other provisions of the Constitution that mention 'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset."). Third, Judge Pittman noted the Second Amendment's focus on the "militia," which historically always included those over the age of 18. 623 F. Supp. 3d at 749-51.[5]

Lastly, in addition to the skepticism of the six judges who penned a dissent from denial of rehearing in *NRA II* (714 F.3d at 335), this Court's **recent** opinions have implicitly rejected *NRA*'s nonbinding analysis. For example, the *NRA* panel believed that the government may "target[] particular groups for public safety reasons." *NRA*, 700 F.3d at 200 (relying on unspecified loyalty oath laws, citing law review articles for

---

[5] As Plaintiffs briefed below, "it is plainly evident that young adults had the same rights to keep and bear arms as their elder counterparts during the Ratification Era." ROA.125. In fact, many Founding-era militia laws contemplated 18-year-olds bringing their own arms to militia service. *See* ROA.125; *see also Jones*, 34 F.4th at 717 ("the colonial militias almost always included all men 18 and older.... [A]t the time of the founding, all states required young adults to serve in the militia, and all states required young adults to acquire and possess their own firearms."); *see also Hirschfeld*, 5 F.4th at 424-34 (compiling and discussing militia laws in great detail).

the notion that the state can "'disarm those it deemed likely to disrupt society,'" "'confiscate weapons from anyone deemed untrustworthy,'" and "'forbid[] suspect groups from having arms,'" and concluding that the government appropriately may "disarm[] select groups for the sake of public safety"). The *NRA* panel further relied on the purported "classical republican notion that only those with adequate civic 'virtue' could claim the right to arms," referencing only law review articles (not primary sources) in support. *Id.* at 201. *But see Kanter v. Barr*, 919 F.3d 437, 462-63 (7th Cir. 2019) (Barrett, J., dissenting) ("no evidence that virtue exclusions ever applied to individual … rights"); *see also Range v. AG United States*, 69 F.4th 96, 102 (3d Cir. 2023) ("We are confident that the Supreme Court's references to 'law-abiding, responsible citizens' do not mean that every American who gets a traffic ticket is no longer among 'the people' protected by the Second Amendment.").

In stark contrast to the methodology used in this Court's 2012 *NRA* decision, a panel of this Court recently struck down 18 U.S.C. § 922(g)(8)'s ban on firearm possession by those under domestic violence restraining orders. *See United States v. Rahimi*, 61 F.4th 443, 457 (5th Cir. 2023). In so doing, the panel concluded that the government's

18

"'dangerousness' analogues" – the notion the government could "disarm[] classes of people considered to be dangerous" – not only were "question[able]," but also were inapposite to Section 922(g)(8), in that most such "'disarmament efforts were meant to prevent armed rebellions.'" *Id.* Even the government has not argued that young adults are purchasing firearms to participate in armed rebellions.

More recently, another panel of this Court explained that "no one piece of historical evidence suggests that when the Framers ratified the Second Amendment, they authorized Congress to disarm anyone it deemed dangerous … the legislature cannot have unchecked power to designate a group of persons as 'dangerous' and thereby disarm them." *United States v. Daniels*, 77 F.4th 337, 350, 353 (5th Cir. 2023). In other words, since *Bruen*, this Court at least twice has implicitly rejected the purported "historical analysis" conducted more than a decade ago in *NRA*.

At bottom, this Court's prior panel opinion in *NRA* is nonbinding and should not be followed, because any historical analysis performed was incidental to the ultimate decision, and the panel explicitly denied resolving the question at issue here. Since then, *NRA*'s historical

analysis has been superseded, because it did not apply the sort of rigorous scrutiny that *Bruen* requires. Its reasoning and conclusions have also been questioned and criticized (if not ignored outright) not only by district courts nationwide, but also by recent decisions of this Court. Finally, *NRA*'s ultimate conclusion is at odds with the Supreme Court's clear holdings that the Second Amendment protects "adults" and applies to "all Americans." The text of the Second Amendment, the Supreme Court's teachings, and the unblemished historical record (contemporaneous to the Founding) "couldn't be clearer: the right to keep and bear arms belonged to citizens 18 to 20 years old." *NRA II*, 714 F.3d at 339 (Jones, J., dissenting). The district court was correct to conclude as much.[6]

### b. The District Court Correctly Concluded that the Government Failed to Meet Its Burden to Demonstrate a Broad and Enduring Historical Tradition of Similar Regulation.

---

[6] Separately, the district court correctly found that "the right to acquire a firearm is likely protected by the Second Amendment as several circuits have held." ROA.301 n.17. The government does not appear to have challenged this finding, which by now is well-established. *See, e.g.*, *Bezet v. United States*, 714 F. App'x 336, 341 (5th Cir. 2017); *United States v. Hicks*, 2023 U.S. Dist. LEXIS 35485, at *5 (W.D. Tex. Jan. 9, 2023); *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010); *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *Teixeira v. County of Alameda*, 873 F.3d 670, 677-78 (9th Cir. 2017).

The district court correctly described the *Bruen* analytical framework: "'[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.'"  ROA.299-300 (citing *Bruen*, 142 S. Ct. at 2129-30).  Applying that test, the district court correctly found that "Plaintiffs have sufficiently shown that their conduct is covered by the Second Amendment," because "Plaintiffs are within 'the people' envisioned by the Second Amendment."  ROA.300, 301 n.17.  Then, the district court correctly concluded that, pursuant to *Bruen*, this "leav[es] only the question of whether the Government can justify these restrictions with the requisite historical analogues."  ROA.300.  And the district court correctly answered that question in the negative, explaining that "the Government does not cite to specific founding era restrictions" to justify the Challenged Provisions.  ROA.300; *accord Hirschfeld*, 5 F.4th at 438 ("[w]hile some gun regulations existed at the Founding, there were no regulations restricting minors' ability to possess or purchase weapons....").  Indeed, by finding Plaintiffs to be members of "the people," the district court rejected (*see* ROA.301 n.17) the limited oblique

references the government had made to historical sources,[7] consisting largely of reviewing what other courts had stated and referencing various treatises and law review articles.  ROA.203-14.

### c. The District Court Erred by Elevating Various Ambiguous and Inapposite Dicta Above *Bruen*'s Clear Instruction to Conduct a Historical Analysis in *Every* Case.

When, as here, "presumptive[] protect[ion]" under the Second Amendment is established under *Bruen* and where, as here, the government fails to meet its "burden" to rebut that presumption with a robust showing of a broad and enduring historical tradition of similar restrictions, the appropriate course of action should have been to grant a preliminary injunction.  But the district court denied that relief, relieving the government of its "burden" to show a historical tradition, in conflict with the Supreme Court's holding that "**[o]nly**"[8] after such a showing is

---

[7] With respect to statutes that arose nearly three-quarters of a century after ratification, *Bruen* made clear that such sources "do not provide as much insight into [the Second Amendment's] original meaning as earlier sources." 142 S. Ct. at 2137; *see also Hirschfeld*, 5 F.4th at 437 ("there were no regulations restricting minors' ability to possess or purchase weapons until two states adopted such laws in 1856"); 5 F.4th at 440 ("State laws passed decades after the ratification restricting gun ownership—at a time when state laws were used to disarm disfavored groups—is weak evidence of the original scope of the Second Amendment"); *NRA II,* 714 F.3d at 337 (Jones, J., dissenting) ("Post-Civil War sources" less historically relevant than Founding-era sources).

[8] The word "only" is absolute, not subject to modification.  It means "alone of its … kind; by itself … sole." Webster's New World College Dictionary (4th ed. 2010).

22

made "may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 142 S. Ct. at 2130.    Rather, the district court found another way (three, in fact) to uphold the Challenged Provisions, theorizing that "the Supreme Court has already recognized the viability of certain regulations or limitations on Second Amendment rights." ROA.300.

### 1. The Challenged Provisions Cannot Be Justified Based on Prohibitions that Apply to Felons and the Mentally Ill.

First, the district court erroneously concluded that the Challenged Provisions could be justified without further analysis because they "serve to ensure" the "prohibitions on the possession of firearms by felons and the mentally ill." ROA.302, 300 (citing *Heller*, 554 U.S. at 626-27).    As the district court noted, *Heller* called such restrictions "presumptively lawful." ROA.300 (citing *Heller*, 554 U.S. at 627 n.6).    But even if the district court were correct that this *dictum* somehow exempts certain provisions from the explicit *Bruen* "presumpti[on]" of unconstitutionality and analysis under the *Bruen* framework – the "only" framework for resolving Second Amendment cases – it would support only the existing 18 U.S.C. § 922(d) and (g) prohibitors against people who *are actually* felons or mentally ill.

23

As then-Judge Barrett explained, any purported government "power [to disarm people who are dangerous] extends only to people who are dangerous," rejecting the notion that "the legislature can disarm [people] without regard to whether they are dangerous." *Kanter*, 919 F.3d at 451, 462 (Barrett, J., dissenting). In stark contrast, the Challenged Provisions are not "prohibitions on the possession of firearms by felons and the mentally ill" – rather, they impose a deindividualized, blanket restriction on *all* 18-to-20-year-old adults regardless of their criminal or mental history. And Plaintiffs already have established that they are not prohibited persons. *See* ROA.9-10; ROA.192 (Defendants acknowledging McRorey passed a background check); ROA.233 (Declaration of David Alan Fazzini) (Flores does not have responsive records but has remained pending). For that reason, the district court's reliance on this Court's decision in *United States v. Daniels*, 77 F.4th 337 (5th Cir. 2023), is inapposite. Rather, as the Fourth Circuit explained, laws such as those challenged here "restrict the rights of overwhelmingly law-abiding citizens." *Hirschfeld*, 5 F.4th at 410; *see also NRA II*, 714 F.3d at 343 (Jones, J., dissenting) ("drawing analogies between this age

group and felons and the mentally ill is not only offensive but proves too much").

Indeed, such logic contains no limiting principle.  Preventing *all* Americans from purchasing firearms (or banning firearms entirely) certainly would "serve to ensure" that dangerous or unstable people are disarmed – but at the cost of the constitutional rights of all "the people." Likewise, requiring an "enhanced background check" on a large segment of "the people" (young adults) might at the margin make it more difficult for a few prohibited persons to acquire firearms, but at the cost of the Second Amendment rights of an entire marginalized class of Americans. As Judge Jones put it, "the implications of [such a] decision – that a whole class of adult citizens, who are not as a class felons or mentally ill, can have its constitutional rights truncated because Congress considers the class 'irresponsible' – are far-reaching."  *NRA II*, 714 F.3d at 335 (Jones, J., dissenting).[9]

---

[9] *See also* oral argument in *Maryland Shall Issue, Inc. v. Moore*, No. 21-2017 (4th Cir. Mar. 10, 2023) (Judge Richardson opining that "you've got a community, and you think a crime is about to occur … and you round up everybody … for thirty days … and you say … Most of you, y'all are great, you're law-abiding citizens. But somebody here is bad, and you might be planning on doing something bad. … We would say that is an infringement of the Fourth Amendment, right, even if it was designed to protect the public....").

The district court's erroneous reliance on inapposite dicta absolved Defendants of their obligation to prove a historical tradition of disparate treatment of firearm acquisition by 18-to-20-year-olds. As discussed *supra*, multiple courts already have stated that no such tradition has been shown to exist – the district court included. *See* ROA.300; *Hirschfeld*, 5 F.4th at 407; *Polis*, 2023 U.S. Dist. LEXIS 137087, at \*47; *Swearingen*, 545 F. Supp. 3d at 1256 ("if such a law existed, someone surely would have identified it by now."). The district court's facial reliance on dicta about felons and the mentally ill also relieved the district court of necessary "how" and "why" analogical analysis under *Bruen*, 142 S. Ct. at 2133 (*i.e.*, comparing mechanisms and motivations).

While it is clear that felons[10] and the mentally ill[11] have existed throughout American history, even if the Founders restricted their rights to firearms, such restrictions did not operate by indiscriminately delaying[12] the firearm purchases of all law-abiding persons.  Nor are

---

[10] To be sure, *Bruen* explicitly rejected the notion that interest balancing could be used to justify a government infringement of Second Amendment rights.  142 S. Ct. at 2131.  That said, if the purported societal purpose of the Challenged Provisions is "serv[ing] to ensure that FFLs do not transfer firearms to" felons (ROA.302), the Challenged Provisions are a horrible fit, because the odds of someone becoming a felon by age 21 – as opposed to older adults – is cosmically small.  According to the Bureau of Prisons, felons age 21 and younger account for just 0.9 percent of the total prison population, with nearly three-quarters of the prison population being between the ages of 26 and 50.  *See Inmate Age*, Bureau of Prisons, https://tinyurl.com/2n4tns44 (Oct. 14, 2023).  Presumably, these numbers would be even more heavily weighted in favor of young adults (*i.e.*, less than 0.9 percent) when including convicted felons who have been released, since no one gets younger after release from prison.  In other words, if the goal of the Challenged Provisions is to keep felons from obtaining firearms, then it would seem middle-age adults (not young adults) should be the target of "enhanced background checks."

[11] Consider the application of this reasoning to the opposite end of the age spectrum.  If an automatic and indefinite waiting period for young adults is valid simply because it "serve[s] to ensure" that *some* (a tiny percentage) might be denied a firearm over a juvenile mental health record, ROA.302, so too might Congress choose to discriminate against geriatric access to firearms, based on the reality that some older people suffer from age-related "short temper and aggression" or experience "[d]ifficulty recognizing faces and people" – situations where firearm access might cause policymakers apprehension.  *Mild Cognitive Impairment (MCI)*, Mayo Clinic (Jan. 18, 2023), https://tinyurl.com/466kbdyw; *The Seven Stages of Dementia*, Dementia.org, https://tinyurl.com/3k5ezutn (last visited Oct. 19, 2023).  On the contrary, Congress has no more authority to relieve senior citizens of their Second Amendment rights than it does young adults.

[12] To the extent that the district court faulted Plaintiffs for failing to "show[] that the potential waiting periods here are 'indefinite' or that a potential ten-business-day waiting period is unconstitutional in all cases," ROA.303, the opposite is true.  As Plaintiffs discussed, the delays the Challenged Provisions impose are of variable and unascertainable length and are therefore *by definition* "indefinite." *See Indefinite*, Merriam-Webster, https://tinyurl.com/3cetetcw (last visited Oct. 19, 2023) ("not precise : vague, having no exact limits"); *supra* note 1 (collecting real wait times that

young adults some "unprecedented societal concern[]" warranting a loosening of analogical stringency. *Bruen*, 142 S. Ct. at 2132. Rather, "the members of the first Congress were ignorant of thermal heat imaging devices; with late teenage males, they were familiar." *NRA II*, 714 F.3d at 342 (Jones, J., dissenting).

### 2. The Challenged Provisions Cannot Be Justified as "Conditions and Qualifications on the Commercial Sale of Arms."

Second, the district court did not reach the required *Bruen* historical analysis because it erroneously concluded that the Challenged Provisions constitute "laws imposing conditions and qualifications on the commercial sale of arms," and thus are conclusively constitutional. ROA.300. As a preliminary matter, any nebulous class of restrictions that purportedly constitute "laws imposing conditions and qualifications on the commercial sale of arms" suffers from total ambiguity. Without any limiting principle, a federal law imposing a 100,000% tax on each commercial firearm sale would be a "condition" on firearm sales and

---

young adults have undergone); ROA.16-20 ¶¶21-34 (detailing precisely how the Challenged Provisions operate to impose indefinite delays); ROA.298 (acknowledging that Plaintiff Flores still had not received her firearm as of the district court's August 3, 2023 hearing, despite a theoretical permissible transfer date of May 27, 2023).

remain "presumptively constitutional" – thereby avoiding the *Bruen* framework.  Similarly, a requirement that a person be seven feet tall in order to buy a gun could be deemed a "qualification" on the commercial sale of arms.

Rather, not every law that involves the transfer of a firearm is a "regulation on the commercial sale of arms."  And, "[o]f course, not every regulation on the commercial sale of arms is presumptively lawful." *Rigby v. Jennings*, 630 F. Supp. 3d 602, 613 (D. Del. 2022).  For example, striking down 18 U.S.C. § 922(k)'s ban on obliterating a firearm's serial number, a federal district court flatly rejected the government's contention that the law was constitutional without historical analysis based on the government's characterization of it as a commercial regulation.  *United States v. Price*, 635 F. Supp. 3d 455, 459 (S.D. W. Va. 2022).  Without any further exposition as to *which* sorts of laws the Supreme Court presumed would have historical support when challenged, no court can label a given restriction definitively "commercial" in nature and thus definitively exempt it from the *Bruen* framework.

More fundamentally, however, the district court was wrong to implicitly conclude that the Challenged Provisions – imposing a waiting period *on the private buyer* and impeding the buyer's *acquisition* of a firearm – are mere "conditions and qualifications on the *commercial sale* of arms." Plaintiffs are aware of at least two courts that have rejected such reasoning. First, *Price* explained that "commercial regulations that apply only to manufacturers and sellers do not implicate an individual's right of possession. … [T]he statute at issue here is not a commercial regulation. … It criminalizes the mere possession of a firearm … whether or not the firearm is then placed into commerce." 635 F. Supp. 3d at 461. Even more on point, analyzing the ban on 18-to-20-year-olds acquiring handguns, the Fourth Circuit in *Hirschfeld* found that "these laws are not 'conditions and qualifications on the commercial sale of arms.' A condition or qualification on the sale of arms is a hoop someone must jump through to *sell* a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records." 5 F.4th at 416 (emphasis original) (citation omitted); *see also id.* (contrasting the federal ban on handgun sales to young adults with a law that "placed no restrictions on those seeking to buy guns"). In other words, even if the

district court was correct that certain "commercial sale" restrictions can be found constitutional without any historical analysis, the Challenged Provisions still do not qualify.

### 3. The Challenged Provisions Cannot Be Justified Based on "Shall-Issue" Concealed Carry Permitting Regimes.

Finally, the district court erroneously relied on *Bruen*'s acknowledgement of "the 43 States' 'shall issue' licensing regimes" as evidence of "the facial constitutionality of regimes requiring background checks and attendant waiting periods to ensure a potential purchaser is not prohibited from exercising Second Amendment rights, so long as the waiting periods are not 'lengthy.'" ROA.301. According to the district court, "the Supreme Court has also noted that some wait time is permissible to ensure that those prohibited are unable to obtain firearms." ROA.302. *Bruen* says no such thing – not even implicitly.

For starters, the "shall-issue" permitting schemes briefly discussed (not approved) in *Bruen* are *entirely optional* in a majority of states, most of which offer permits to their residents on a *voluntary* "shall-issue" basis, and the vast majority of which (currently 26 of the 43 that were

"shall-issue" when *Bruen* was decided[13]) are "constitutional carry" jurisdictions where *no permit is required* to carry a firearm (and thus no background check is needed before one may carry a firearm). *Bruen* acknowledged as much. 142 S. Ct. at 2123 n.1. What is more, *Bruen* acknowledged that certain states "have no licensing requirement for open carry." *Id.* Moreover, of the states *Bruen* discussed that do not permit unlicensed constitutional carry, the majority of them (currently 12 of the 17 that remain[14]) permit *open carry without a license.* In other words, only a few states require a person to go through a permitting process involving a government background check *before* being able to carry a handgun in public for self-defense.

Second, the district court's conclusion that *Bruen* "seems to acknowledge the facial constitutionality" of shall-issue regimes "requiring background checks and attendant waiting periods" (ROA.301) is flat wrong. One district court called such a claim "just disingenuous," when made by the government. *Antonyuk v. Hochul*, No. 1:22-cv-00986,

---

[13] *See Constitutional Carry/Unrestricted/Permitless Carry*, USCCA, https://tinyurl.com/28axkx44 (last visited Oct. 23, 2023).
[14] *See Open Carry*, OpenCarry.org, https://tinyurl.com/47f46r3e (last visited Oct. 23, 2023).

ECF #73 (N.D.N.Y. Oct. 25, 2022), Hearing Transcript at 60:10-15.[15] Another district court was gentler, but similarly concluded that "*Bruen* did not pass on the constitutionality of the Connecticut law because that law was not before the Court … This Court cannot accept *Bruen*'s passing reference to Connecticut's firearm law as the Supreme Court's wholesale approval of similar licensing laws." *Koons v. Platkin*, 2023 U.S. Dist. LEXIS 85235, at \*55 (D.N.J. May 16, 2023). *Bruen*'s cautioning statements, then, were nothing more than that. They merely acknowledged what *was* and what *was not* before the Court, and cautioned future litigators (and judges) against drawing the very sort of conclusion the district court drew – that *Bruen* somehow considered and decided the constitutionality of thousands of other state statutory provisions that were not at issue.

Third, even if *Bruen* somehow could be read to have approved of background checks and waiting periods for concealed *carry* permitting, that is a far cry from the waiting period imposed on young adults here, making them wait days or weeks *merely to acquire* a firearm[16] even to

---

[15] https://tinyurl.com/mr2342rx.

[16] *See, e.g.*, *USCCA's Concealed Carry Reciprocity Map & Gun Laws by State*, <u>USCCA</u>, https://tinyurl.com/3b6b5b5f (last visited Oct. 23, 2023) (reporting that only ten

keep at home for self-defense. Indeed, many states (even shall-issue ones) do not issue carry permits to 18-to-20-year-olds at all. If all of those regimes are definitively constitutional after *Bruen*, that would mean those states' carry bans for young adults are constitutional without analysis. Unsurprisingly, that was not the approach taken by another district judge in this Circuit. *See McCraw*, 623 F. Supp. 3d at 752 (striking down Texas' carry ban for young adults).

The district court's error was threefold: *first*, the court erroneously assumed *Bruen* approved of all shall-issue licensing regimes; *second*, the court assumed that this further constituted blanket approval of the background checks and waiting periods inherent in such licensing schemes; and *third*, the court erroneously assumed that background checks and waiting periods must be constitutional in other applications (not just licensing for public carry). But if it is the case that *Bruen* determined *all manner* of background checks constitutional without further analysis, that would include, for example, background checks required to purchase ammunition in California and New York. *See* Cal.

_____

States and the District of Columbia require a permit to purchase a firearm); *see also Yukutake v. Conners*, 554 F. Supp. 3d 1074 (D. Haw. 2021) (holding various portions of Hawaii's permit-to-purchase law unconstitutional).

Penal Code § 30312(a)-(b); N.Y. Penal Law § 400.03; *see also Rhode v. Becerra*, 445 F. Supp. 3d 902 (S.D. Cal. 2020) (striking down the California ammunition background check, albeit prior to *Bruen*). New York has even proposed a background check to purchase a 3D printer.[17] *Bruen*'s cursory footnote discussion of "shall-issue" permitting regimes clearly cannot be read to have resolved the constitutionality of all of these novel Second Amendment infringements.

Lastly, the district court's conclusion that *Bruen* broadly resolved the issue of background check waiting periods cannot be squared with its earlier finding that Plaintiffs are part of "the people" protected by the Second Amendment – no different than other adults. ROA.301 n.17. If young adults are no different than other adults, the district court's logic would justify the Challenged Provisions' waiting period of days or weeks (or potentially longer) imposed on <u>all Americans</u>. *See* ROA.248. What is more, justifying the waiting period imposed by the Challenged Provisions based on concealed carry permit waiting periods would mean that <u>Congress could enact a waiting period of up to four months merely to</u>

---

[17] Michael Kan, *NY State Bill Would Require Background Checks to Buy 3D Printers*, <u>PCMag</u> (Oct. 16, 2023), <u>https://tinyurl.com/48hx5dtf</u>.

purchase a firearm. *See* ROA.206 n.6 (noting that Nevada allows 120 days to issue a concealed carry permit).[18]

It seems highly unlikely that any court would find constitutional a uniform, nationwide, four-month waiting period in order to purchase a firearm, but that is where the district court's reasoning leads. But imagine a four-month waiting period before a person could post a tweet (on the theory that it might include a threat of violence), or a four-month waiting period for a pastor to give a sermon (which might include electioneering and implicate the church's tax-exempt status). Such restrictions would be patently unconstitutional. Unless the Second Amendment is a second-class right (Americans have been promised that it is not, *Bruen*, 142 S. Ct. at 2156), the Challenged Provisions cannot be justified by reference to *Bruen*'s passing dicta about "shall-issue" permitting regimes.

### 4. The *Bruen* Framework Must Be Faithfully Applied, Every Time, Without Exception.

---

[18] The government appears to invite precisely that sort of conclusion, referencing the alleged "repeated assurances" from the Supreme Court "that shall-issue licensing regimes … are facially consistent with the Second Amendment," and pointing out that "many … afford States longer than ten business days to complete...." ROA.193.

It was error for the district court to forego the historical analysis required by *Bruen*, and to absolve the government of its burden to show a broad and enduring historical tradition to justify the Challenged Provisions.  On the contrary, the *Bruen* framework must be applied in each and every case.  *Bruen* explicitly instructs as much, stating that its methodology is the "***only***" way for a court to conclude a restriction to be constitutional.  142 S. Ct. at 2126.  Even if various *dicta* from *Heller* and/or *Bruen* arguably might reference or implicate a given firearm restriction, the *Bruen* framework still applies when the restriction is challenged – even to "longstanding" laws (*Heller*, 554 U.S. at 626),[19] even if certain are "presumptively lawful" (*id.* at 627 n.26),[20] even if implicating "sensitive places" (*id.* at 626),[21] and even if arguably "commercial" (*id.* at 626-27) in nature.[22]

---

[19] *See Espinoza*, 140 S. Ct. at 2258-59 (evidence that "more than 30 States" began adopting a practice "in the second half of the 19th century" cannot "by itself establish an early American tradition").

[20] *See Range*, 69 F.4th 96 (18 U.S.C. § 922(g)(1) ban on felon possession unconstitutional as applied).

[21] *See Bruen*, 142 S. Ct. at 2118 ("there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place'").

[22] *See Rigby*, 630 F. Supp. 3d at 613 ("not every regulation on the commercial sale of arms is presumptively lawful").

It is clear that the Supreme Court never intended these speculative categories to be unquestionable, untestable "givens" in Second Amendment law. *See Heller*, 554 U.S. at 635 ("there will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when those exceptions come before us."). Presumptions can be rebutted, such as when a previously assumed historical tradition does not actually exist. Indeed, several challenges to so-called "presumptively" constitutional restrictions already have succeeded. *See, e.g.*, *Range*, 69 F.4th 96 (successful as-applied challenge to 18 U.S.C. § 922(g)(1) (felons)); *Tyler v. Hillsdale Cnty. Sheriff's Dep't*, 837 F.3d 678, 688 (6th Cir. 2016) (allowing a challenge to 18 U.S.C. § 922(g)(4) (mentally ill) to proceed and observing that "*Heller*'s presumption of lawfulness should not be used to enshrine a permanent stigma on anyone who has ever been committed to a mental institution for whatever reason"). If use of Supreme Court *dicta* in lieu of the *Bruen* framework was appropriate, none of these successful challenges would have made it out of the starting gate.

Disputing the methodology employed by the district court below, a district court in Kentucky recently noted that "[n]o one would read the

First or Fourth Amendments in th[at] way … judges [may not] interpret shorthand passages from the lengthy opinions in *Heller* and *Bruen* as one would parse a legal code.  This is unconvincing.  …  The phrases the Government quotes from *Heller* and *Bruen* reflect, rather than create, limits on the holdings of those opinions.  Disclaimers about 'the matters [that] have been left open' … don't relieve judges and litigants of the 'legal heavy lifting' … necessary to examine the historical justifications" of a given law.  *United States v. Silvers*, 2023 U.S. Dist. LEXIS 77061, at *16-17 (W.D. Ky. May 3, 2023); *see also Koons*, 2023 U.S. Dist. LEXIS 85235, at *55 ("This Court cannot accept *Bruen*'s passing reference to Connecticut's firearm law as the Supreme Court's wholesale approval of similar licensing laws. Rather, this Court must determine whether [the laws] are supported by well-established and representative historical firearm laws."); *Polis*, 2023 U.S. Dist. LEXIS 137087, at *33 ("the Court disagrees with the Governor's reading of *Heller* as exempting certain types of regulations at the first step of the *Bruen* test.  *Bruen* does not suggest that a different test applies to certain categories of laws or regulations. … Rather, *Bruen* is clear that the government must justify the constitutionality of any law regulating conduct covered by the plain

text of the Second Amendment."); *United States v. Perez-Gallan*, 640 F. Supp. 3d 697, 716 (W.D. Tex. 2022) (emphasis added) ("*Bruen*'s mandate is that a gun regulation's constitutionality hinge solely on the historical inquiry. According to *Bruen*, that can be this Court's *only* consideration."); *United States v. Bullock*, 2023 U.S. Dist. LEXIS 112397, at *68 (S.D. Miss. June 28, 2023) (acknowledging "*Heller*'s repeated statements about 'law-abiding, responsible citizens'" and not casting doubt on "'longstanding prohibitions on the possession of firearms by felons,'" but concluding that such dicta "are not controlling. The new standard articulated in *Bruen* applies."); *United States v. Guthery*, 2023 U.S. Dist. LEXIS 54072, at *14-15 (E.D. Cal. Mar. 28, 2023) (same: acknowledging dicta but conducting a historical analysis of felon dispossession).

The weight of authority is thus contrary to the district court's conclusion that various phrases from *Heller* and *Bruen* somehow absolve the government of its burden to prove a broad and enduring historical tradition to justify certain firearm laws. Rather, the *Bruen* methodology applies uniformly – *in every case*. The district court's failure to complete

the required analysis (and grant an injunction against enforcement of the

Challenged Provisions) was error.

## II.    Plaintiffs Have Suffered and Will Continue to Suffer Irreparable Harm Absent Preliminary Relief.

Although the district court conducted only "the first step of the …

preliminary injunction analysis," ROA.303, dispensing with Plaintiffs'

motion on the likelihood-of-success prong, had the court proceeded to

analyzing the other factors for injunctive relief, it would have found that

Plaintiffs have, are, and will continue to suffer serious irreparable harm

because of the Challenged Provisions.

In this Circuit, it "is not necessary to demonstrate that harm is

inevitable and irreparable … [t]he plaintiff need show only a significant

threat of injury from the impending action, that the injury is imminent,

and that money damages would not fully repair the harm." *Anibowei v.

Morgan*, 70 F.4th 898, 902 (5th Cir. 2023) (alterations in original); *see

also Missouri v. Biden*, 2023 U.S. App. LEXIS 26191, at *91 (5th Cir. Oct.

3, 2023) ("The correct standard is whether a future injury is 'likely'").

When it comes to constitutional rights, both the Supreme Court and

this Circuit's precedents are clear that "irreparable harm occurs

whenever a constitutional right is deprived, even for a short period of

time." *Def. Distributed v. U.S. Dep't of State*, 865 F.3d 211, 214 (5th Cir. 2017) (Elrod, J., dissenting from denial of rehearing); *see also Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Missouri*, 2023 U.S. App. LEXIS 26191, at *90-91 (same); *Bruen*, 142 S. Ct. at 2156 ("The [Second Amendment] is not … subject to an entirely different body of rules than the other Bill of Rights guarantees.").

Because Plaintiffs have been delayed in acquiring firearms by the Challenged Provisions (ROA.92, 95, 97), and have alleged their continued desire and intent to purchase additional firearms from licensed firearm dealers,[23] as a matter of law Plaintiffs will be subject to the Challenged Provisions every time they do so (until they turn 21), creating an

---

[23] *See, e.g.*, ROA.93 (Declaration of Ethan McRorey) ("I fully intend to purchase additional firearms in the future, including before I turn 21, and I do not believe I should be mandated to wait any longer than any other adult to exercise my Second Amendment rights, simply because of my age."); *see also* ROA.262 (having already acquired a second firearm and been irreparably harmed a second time). Moreover, some of the "many thousands" of the young-adult members and supporters represented by the organizational Plaintiffs "have purchased, are in the process of purchasing, or desire to, intend to, or will attempt to purchase firearms before reaching the age of 21." ROA.39 (Declaration of Megan Browning); *see also* ROA.301 n.17 (correctly finding that "[t]hese facts suggest that Plaintiffs' claims may not be moot"). In other words, future harm to Plaintiffs is more than "likely."

unavoidable delay in their acquisition of arms.  That harm to Plaintiffs' rights is not just "likely" but borders on certain, as the background check and attendant waiting period imposed by the Challenged Provisions are entirely unavoidable.  Indeed, as the district court noted, "at the August 3, 2023 hearing before this Court, Plaintiffs' counsel stated that Ms. Flores had still not received her firearm" (ROA.298) – a background check that long since has timed out under ATF's 30-day rule.  *See supra* note 2. There is no denying that the Challenged Provisions are causing serious and ongoing delays to the acquisition of firearms by an entire class of persons, Plaintiffs included, violating their Second Amendment rights and causing them irreparable harm.

At bottom, even a sufficient facial allegation of constitutional harm suffices for injunctive relief to issue.  *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (citing with approval 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995)) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary.").  That is why the Ninth Circuit has held that a court may not "deny a motion for a

preliminary injunction without analyzing the plaintiff's likelihood of success" when "a plaintiff alleges a constitutional violation." *Baird v. Bonta*, 2023 U.S. App. LEXIS 23760, at *6-8 (9th Cir. Sept. 7, 2013).

As the district court found, Plaintiffs have made a sufficient preliminary showing that their Second Amendment rights are being infringed.[24] Thus, if this Court finds that Plaintiffs are correct that the Challenged Provisions violate the Second Amendment, it follows that irreparable harm to Plaintiffs' constitutional rights is conclusively demonstrated.[25]

## III. The Balance of Equities Weighs Heavily in Plaintiffs' Favor.

When the government is a party, the balance-of-equities and public-interest factors merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The district court did not consider these factors but, had it done so, it would

---

[24] *See* ROA.300 ("Plaintiffs have sufficiently shown that their conduct is covered by the Second Amendment....").

[25] Another federal court found irreparable harm in an indistinguishable situation, where young adults challenged federal laws and regulations prohibiting the sale of handguns to 18-to-20-year-olds. *Fraser v. BATFE*, 2023 U.S. Dist. LEXIS 154088, at *9-11 (E.D. Va. Aug. 30, 2023) ("it does not matter that, one day, Plaintiffs will age out of the prohibited category" because the plaintiffs "have suffered an 'irreparable injury'" by virtue of "their constitutional rights hav[ing] been, and continu[ing] to be, denied by the Government's conduct in enforcing the challenged statutory and regulatory regime."); *see also id.* (dispensing with the government's tired, victim-blaming argument that a court should ignore irreparable constitutional harm just because alternative avenues exist whereby a plaintiff may avoid the harm suffered, such as "lawfully obtain[ing] handguns as a gift from their parents").

have found that they weigh heavily in Plaintiffs' favor. For the same reason as a finding of a likelihood of success on the merits should largely resolve the irreparable-harm analysis, a finding that the Challenged Provisions likely violate Plaintiffs' Second Amendment rights demonstrates conclusively that the government has no interest in infringing those rights, and the public interest will be served by constitutional fidelity.

While the harm to Plaintiffs is clear – they are indefinitely impeded from exercising their Second Amendment right to acquire firearms – any possible harm to the government is entirely speculative and theoretical – that some young adult, (i) with a disqualifying record (ii) which does not already appear in the NICS databases (iii) might be discovered based on a further review of state records, and (iv) will be prevented from acquiring a firearm, (v) will not be able to acquire a firearm otherwise (including illegally), and thus (vi) will be thwarted in committing some criminal act using (vii) a shotgun or rifle (the only firearms young adults may purchase, but which are rarely used in crimes). *See* ROA.132.

Needless to say, any possible harm to the government or the public from an order *temporarily* enjoining the Challenged Provisions requires

45

speculation layered on speculation, and pales in comparison to the known, real-world, irreparable harms to constitutional rights, not to mention the very real risk to life and limb for young adults. Individuals between 18 and 20 years of age often are not already gun owners and, because of the Challenged Provisions, will be delayed in obtaining firearms with which to defend themselves. The balance of equities is strongly in Plaintiffs' favor.

Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citation omitted); *see also Opulent Life Church*, 697 F.3d at 298 (citation omitted) ("injunctions protecting First Amendment freedoms are always in the public interest.").

## CONCLUSION

When the President signed the so-called "Bipartisan Safer Communities Act," the Challenged Provisions were presumptively unconstitutional out of the gate. They indiscriminately prevent an large subset of "the people" from acquiring firearms, a natural prerequisite to "keep[ing] and bear[ing] Arms." U.S. Const. amend. II. The district court

found as much.  Indeed, no such restriction ever has been implemented in this Nation's history (and certainly not contemporaneously with the Founding era), thus evincing a widespread understanding among the Second Amendment's framers and ratifiers that arbitrary, suspicionless delays based solely on an adult citizen's age would be repugnant to the pre-existing rights the Second Amendment preserved.

Dicta cannot supplant express holdings.  Nor can it replace thorough constitutional and historical analysis.  Properly analyzed, the Challenged Provisions' atextual and ahistorical infringements should have been enjoined, and Plaintiffs respectfully request reversal.

Respectfully submitted,

Robert J. Olson
WILLIAM J. OLSON, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
(703) 356-5070
wjo@mindspring.com

Oliver M. Krawczyk
AMBLER LAW OFFICES, LLC
20 South Braddock Street
Winchester, VA 22601
(540) 550-4236
oliver@amblerlawoffices.com

*Counsel for Plaintiffs-Appellants*

/s/*Stephen D. Stamboulieh*
Stephen D. Stamboulieh
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

47

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 9,889 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2.

This brief also complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook 14-point font.

Dated: October 24, 2023

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Counsel for Plaintiffs-Appellants

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit on October 24, 2023, by using the appellate CM/ECF system and that service was accomplished on all counsel of record by the appellate CM/ECF system.

Dated: October 24, 2023

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
Counsel for Plaintiffs-Appellants