No. 23-10837

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

Ethan McRorey; Kaylee Flores; Gun Owners of America, Incorporated; Gun Owners Foundation,

Plaintiffs-Appellants,

v.

Merrick Garland, U.S. Attorney General; Federal Bureau of Investigation,

Defendants-Appellees.

———————————

On Appeal from the United States District Court
for the Northern District of Texas

———————————

**BRIEF FOR APPELLEES**

———————————

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney
General*

CHAD E. MEACHAM
*United States Attorney*

MICHAEL S. RAAB
COURTNEY L. DIXON
*Attorneys, Appellate Staff
Civil Division, Room 7246
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, DC 20530
(202) 353-8189*

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required, as defendants-appellees are all governmental parties.  5th Cir. R. 28.2.1

## STATEMENT REGARDING ORAL ARGUMENT

The district court denied plaintiffs' motion for a preliminary injunction, concluding that plaintiffs are unlikely to succeed on the merits of their claim that any delay on the commercial purchase of a firearm while a background check remains pending facially violates the Second Amendment.  The government does not believe that oral argument is necessary but stands ready to present argument if this Court determines it would aid in its consideration of this appeal.

# TABLE OF CONTENTS

**Page**

STATEMENT OF JURISDICTION ...............................................................1

STATEMENT OF THE ISSUE.....................................................................1

STATEMENT OF THE CASE.......................................................................2

    A.    Statutory Background......................................................................2

    B.    Factual Background and Prior Proceedings..................................6

SUMMARY OF ARGUMENT.......................................................................9

STANDARD OF REVIEW ...........................................................................11

ARGUMENT: THE DISTRICT COURT CORRECTLY DENIED A
PRELIMINARY INJUNCTION.............................................................12

    A.    Plaintiffs Have No Likelihood of Success on the Merits ...........12

        1.    The Second Amendment Does Not Entitle Plaintiffs to
             Commercially Purchase a Firearm Instantaneously Without a
             Background Check ..............................................................13

        2.    Historical Tradition Confirms the Challenged Provisions are
             Lawful ...............................................................................22

    B.    The Remaining Equitable Factors Tilt Sharply Against Relief .................31

CONCLUSION ...........................................................................................33

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Cases:** <u>Page(s)</u>

*Deutsch v. Travis Cty. Shoe Hosp. Inc.,*
721 F. App'x 336 (5th Cir. 2018) .......................................................32

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ...............................................8, 13, 15, 22, 23, 30

*Maryland Shall Issue, Inc. v. Moore,*
86 F.4th 1038 (4th Cir. 2023) ...........................................................21

*McDonald v. City of Chicago,*
561 U.S. 742 (2010) ...........................................................................8

*Moore v. Brown,*
868 F.3d 398 (5th Cir. 2017) ....................................................... 11, 12

*Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,*
78 F.4th 1011 (8th Cir. 2023) ...........................................................32

*National Rifle Ass'n v. Bondi,*
61 F.4th 1317 (11th Cir.), *reh'g en banc granted, vacated,*
72 F.4th 1346 (11th Cir. 2023) .........................................28-29, 29, 30

*National Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
700 F.3d 185 (5th Cir. 2012), *abrogated on other grounds by*
*New York State Rifle & Pistol Ass'n v. Bruen,* 597 U.S. 1 (2022) ........................ 27-28, 28

*New York State Rifle & Pistol Ass'n v. Bruen,*
597 U.S. 1 (2022) ...........................8, 9, 10, 12, 13, 14, 15, 16, 19, 20, 22, 23, 25, 26, 27

*Range v. Attorney Gen. U.S.,*
69 F.4th 96 (3d Cir. 2023) ...............................................................27

*Seoane v. Ortho Pharms., Inc.,*
660 F.2d 146 (5th Cir. 1981) ...........................................................21

*State v. Callicutt,*
69 Tenn. 714 (1878) .........................................................................30

*Teixeira v. County of Alameda,*
   873 F.3d 670 (9th Cir. 2017) ...................................................................25

*Turaani v. Wray,*
   988 F.3d 313 (6th Cir. 2021) ...................................................................20

*United States v. Daniels,*
   77 F.4th 337 (5th Cir. 2023) ....................................................................22

*United States v. Jackson,*
   69 F.4th 495 (8th Cir. 2023) ...............................................................23, 27

*United States v. Libertad,*
   --- F. Supp. 3d ---, 2023 WL 4378863 (S.D.N.Y. July 7, 2023) ..................25

*Vincent v. Garland,*
   80 F.4th 1197 (10th Cir. 2023) ................................................................14

**U.S. Constitution:**

Amend. II .........................................................................................13, 18

**Statutes:**

Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wiss. Sess. Laws 290, 290 ..................29

Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716, 716 ................................29

Act of Apr. 16, 1881, 1881 Ill. Laws 73, 73-74 ............................................26

Act of Apr. 16, 1881, § 2, 1881 Ill. Laws at 73 .............................................29

Act of Feb. 2, 1856, no. 26, § 1, 1856 Ala. Acts 17 .......................................28

Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92, 92 ..............................29

Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59 .....................................29

Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175 ..................................29

Act of July 1, 1890, no. 46, § 1, 1890 La. Acts 39, 39 .....................................29

Act of July 13, 1892, ch. 159, 27 Stat. 116, 116-17 (1893) ...............................26

Act of July 13, 1892, ch. 159, § 5, 27 Stat. at 117 .............................................29

Act of Mar. 5, 1884, ch. 105, §§ 1-2, 1883 Kan. Sess. Laws 159, 159 ...........29

Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468, 468 ...................29

Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Sess. Laws 127, 140.................29

Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421, 421-22..................29

Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86, 86 .............................29

Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656, 656 .........................29

Act of May 14, 1897, ch. 155, § 1, 1897 Tex. gen. Laws 221, 221-22 ...........29

Bipartisan Safer Communities Act,
   Pub. L. No. 117-159, 136 Stat. 1313 (2022) ........................................4

Brady Handgun Violence Prevention Act,
   Pub. L. No. 103-159, 107 Stat. 1536 (1993) ........................................3

Gun Control Act of 1968,
   Pub. L. No. 90-618, 82 Stat. 1213.........................................................2

18 U.S.C. § 921(a)(21) .........................................................................2

18 U.S.C. § 921(a)(21)(C) .....................................................................2

18 U.S.C. § 922(a)(1) ............................................................................2

18 U.S.C. § 922(b)(1)........................................................................ 2, 3

18 U.S.C. § 922(d) .................................................................................2

18 U.S.C. § 922(g) .................................................................................2

18 U.S.C. § 922(t)(1)..............................................................................3

18 U.S.C. § 922(t)(1)(C) ............................................................... 14, 16

18 U.S.C. § 922(t)(1)(C)(ii) ............................................................. 6, 15

18 U.S.C. § 922(t)(1)(C)(iii) ............................................................ 6, 16

18 U.S.C. § 922(t)(2) ............................................................................ 3

18 U.S.C. § 922(x) ............................................................................... 2

18 U.S.C. § 923 ................................................................................... 2

28 U.S.C. § 1292(a)(1) ........................................................................ 1

34 U.S.C. § 40901(*l*)(1) ................................................... 5, 14, 15, 17

34 U.S.C. § 40901(*l*)(2) ..................................................................... 5

34 U.S.C. § 40901(*l*)(3) ..................................................................... 6

Mo. Rev. Stat. § 1274 (1879) ............................................................ 29

Okla. Stat. ch. 25, art. 47, § 3 (1891) ............................................... 29

**Regulations:**

27 C.F.R. § 478.99(b) .......................................................................... 3

27 C.F.R. § 478.124(c)(1) .................................................................... 3

28 C.F.R. § 25.1 *et seq.* ..................................................................... 3

28 C.F.R. § 25.2 .................................................................................. 4

28 C.F.R. § 25.3 .................................................................................. 3

28 C.F.R. § 25.6(c)(1)(iii) .................................................................... 4

28 C.F.R. § 25.6(c)(1)(iv)(A) ............................................................... 4

28 C.F.R. § 25.6(c)(1)(iv)(B) ............................................................... 4

28 C.F.R. § 25.6(c)(1)(iv)(C) ..............................................................................4

28 C.F.R. § 25.7(a) ...............................................................................................3

**Legislative Materials:**

Jonathan H. Duff, Cong. Research Serv. R47310, *Bipartisan Safer Communities Act (P.L. 117-159): Section-by-Section Summary* (2022),
  https://crsreports.congress.gov/product/pdf/R/R47310 ..........................................5

H.R. Rep. No. 103-344 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 1984, 1986 ................3

S. Rep. No. 89-1866 (1966) ................................................................................2

**Other Authorities:**

Act of 1651, *in The Colonial Laws of Massachusetts* (1887) ....................................25

Act of 1777, ch. 6, § 9, *in 24 The State Record of North Carolina*
  (Walter Clark ed., 1905) .................................................................................24

Act of Apr. 18, 1795, ch. 1857,
  *in The Statutes at Large of Pennsylvania from 1682 to 1801* ....................................25

Act of Dec. 1775, *in The Public Records of the Colony of Connecticut From May,
  1775, to June, 1776, inclusive* (Charles J. Hoadly ed., 1890) ...................................24

Act of June 13, 1777, ch. 756,
  *in 9 The Statutes at Large of Pennsylvania from 1682 to 1801*, (1903) .........................24

Act of Mar. 8, 1805, ch. 81, *in The General Laws of Massachusetts*
  (Theron Metcalf ed. 1823) .................................................................................26

Act of Mar. 10, 1821, ch. 167, *in Laws of the State of Maine* (1830) ...............................26

Act of May 1777, ch. 3, in 9 *The Statutes at Large, Being a Collection of All the Laws of
  Virginia, from the First Session of the Legislature, in the Year 1619*
  (William Waller Hening ed. 1821) ......................................................................24

Act of May 1, 1776, ch. 21, §§ 1-2, *in 5 The Acts and Resolves, Public and Private, of the
  Province of the Massachusetts Bay* (1886) ............................................................24

Act of Sept. 20, 1777, ch. 40, § 20,
   *in Acts of the General Assembly of the State of New-Jersey* (1777) ...........................................24

Stephanos Bibas, *The Machinery of Criminal Justice* (2012).....................................................27

1 William Blackstone, *Commentaries on the Law of England* (1765)......................................28

Thomas M. Cooley, *Treatise on Constitutional Limitations* (5th ed. 1883) ...........................30

Dep't of Justice, *Fact Sheet: Update on Justice Department's Ongoing Efforts to Tackle Gun
   Violence* (June 14, 2023), https://perma.cc/W8H2-ZJLT...............................................6

FBI, *Federal Denials*, https://perma.cc/B4BC-LBLG......................................................6

Giffords Law Center, *Browse State Gun Laws*, https://perma.cc/D3QL-8Y5W.............6

Pamela Haag, *The Gunning of America* (2016).........................................................26

Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55 (2016) ...............28

*James Madison's Notes of the Constitutional Convention, August 7, 1787,*
   Yale L. Sch. Avalon Project, https://perma.cc/QJ7B-D4J4 .....................................28

4 *Journals of the Continental Congress* 1774-1789
   (Worthington Chauncey Ford ed. 1906).........................................................23

2 James Kent, *Commentaries on American Law* (1827).........................................................28

Ky. Gen. Stat. ch. 29, art. 29 (Edward I. Bullock & William Johnson eds. 1873).........29

7 *Records of the Colony of Rhode Island and Providence Plantations in New England*
   (John Russell Bartlett ed., 1862)......................................................................24

Merritt Roe Smith, *Harpers Ferry Armory and the New Technology* (1980) ..........................27

## STATEMENT OF JURISDICTION

The district court denied plaintiffs' motion for a preliminary injunction on August 14, 2023.  ROA.303.  Plaintiffs filed a timely notice of appeal that same day.  ROA.304.  This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUE

In the Bipartisan Safer Communities Act (BSCA or Act), Congress expanded the existing background-check process required by federal law for commercial firearms sales to require that investigators contact three additional sources for information when a prospective purchaser is under the age of 21.  Under the Act, the maximum duration a federally licensed firearms dealer must wait while the background check remains pending is 10 business days, after which the dealer is permitted to complete the sale if a final eligibility determination has not yet been made.  The question presented is:

Whether the district court correctly denied plaintiffs' motion for a preliminary injunction where plaintiffs have no likelihood of success on the merits of their claim that the Act's background-check provisions facially violate the Second Amendment and where plaintiffs have failed to establish irreparable harm or that the equities support enjoining the operation of a federal statute designed to better ensure that federally licensed dealers do not sell firearms to prohibited persons who might misuse them.

## STATEMENT OF THE CASE

### A.     Statutory Background

**1.**  Congress enacted the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1213, to "regulate more effectively interstate commerce in firearms" in order to "reduce the likelihood that [firearms] fall into the hands of the lawless or those who might misuse them."  S. Rep. No. 89-1866, at 1 (1966).  Among its provisions, the Gun Control Act limits the commercial sale of firearms to federally licensed dealers, manufacturers, and importers, 18 U.S.C. § 923,[1] and designates several categories of persons for whom it is unlawful to "receive" or "possess" "any firearm," including those convicted of felonies, persons who have been adjudicated as mentally ill, and persons who have been convicted of certain domestic violence crimes, *see id.* § 922(g). It is similarly unlawful to knowingly sell or transfer a firearm to such persons.  *Id.* § 922(d).

Federal law also regulates the possession and commercial purchase of firearms on the basis of age.  Minors under the age of 18 are, with limited exceptions, prohibited from possessing handguns, and federally licensed dealers may not transfer "any firearm" to such individuals.  18 U.S.C. § 922(b)(1), (x).  For individuals aged 18

---

[1] A federal firearms license is required to "engage in the business of importing, manufacturing, or dealing in firearms" or "ammunition."  18 U.S.C. § 922(a)(1).  A person is "engaged in the business" of dealing in firearms, *id.* § 921(a)(21), if that person "devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms," *id.* § 921(a)(21)(C).

2

or older but under the age of 21, federal law does not prohibit firearm possession on the basis of age but restricts the commercial sale of handguns to such individuals. *Id.* § 922(b)(1); *see also* 27 C.F.R. § 478.99(b) (providing federal firearms licensees may not sell any firearms "other than a shotgun or rifle, or ammunition for a shotgun or rifle, to any individual who the [licensee] knows or has reasonable cause to believe is less than 21 years of age").

**2.** In 1993, Congress passed the Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993) (Brady Act), after finding that prohibited persons continued to have "relatively easy access to guns," *see* H.R. Rep. No. 103-344, at 9 (1993), *as reprinted in* 1993 U.S.C.C.A.N. 1984, 1986.

The Brady Act directed the Attorney General to establish and operate a national background check system for federally licensed firearms dealers to contact before selling a firearm to a prospective purchaser. *See* 18 U.S.C. § 922(t)(1), (2). Pursuant to this mandate, the Attorney General established the National Instant Criminal Background Check System (NICS), *see* 28 C.F.R. § 25.1 *et seq.*, which is administered by the Federal Bureau of Investigation (FBI), *see id.* § 25.3.

Before selling a firearm to a prospective purchaser, a licensed dealer must submit certain identifying information about the prospective purchaser to NICS. *See* 28 C.F.R. § 25.7(a); 27 C.F.R. § 478.124(c)(1). NICS performs a background check by comparing this identifying information against three separate databases: (i) the National Crime Identification Center, which contains records on wanted persons,

protection orders, and other persons identified as relevant to NICS searches; (ii) the

Interstate Identification Index, which contains criminal history records; and (iii) the

NICS Index, which contains information on prohibited persons, as defined under

either federal or state law.  *See* 28 C.F.R. §§ 25.2, 25.6(c)(1)(iii).

     If a background check reveals no record indicating that the prospective

purchaser is a prohibited person, NICS indicates to the licensed dealer that it may

proceed with the sale.  28 C.F.R. § 25.6(c)(1)(iv)(A).  If the prospective purchaser's

identifying information matches a record contained in one of the databases and the

record establishes that the person is prohibited from possessing a firearm, NICS

indicates to the licensed dealer that it must deny the sale.  *Id.* § 25.6(c)(1)(iv)(C).  If the

prospective purchaser's identifying information matches a record contained in one of

the databases, but the record is not clear if the person is prohibited, NICS responds to

the licensed dealer that it must delay the sale.  *Id.* § 25.6(c)(1)(iv)(B).  A NICS

examiner then reviews the matching records and obtains additional information, when

necessary, to determine if the prospective purchaser is prohibited from receiving or

possessing firearms.  If it is determined that the purchaser is not a prohibited person,

or if NICS does not follow up with the licensed dealer within three business days of

the instruction to delay, the dealer may proceed with the sale.  *See id.*

     **3.**  On June 25, 2022, Congress enacted the Bipartisan Safer Communities Act,

Pub. L. No. 117-159, 136 Stat. 1313 (2022), following tragic mass shootings at a

grocery store in Buffalo, New York, and an elementary school in Uvalde, Texas—both committed by 18-year-olds.[2]

Among its provisions, the Act expands the background-check process required under the Brady Act for individuals under the age of 21. When a person less than 21 years of age attempts to purchase a firearm from a federally licensed dealer, the Act provides that NICS—in addition to examining the databases discussed above—must "immediately contact" three additional sources to determine whether the prospective purchaser has a juvenile justice or mental health record that would prohibit the sale. *See* 34 U.S.C. § 40901(*l*)(1). Specifically, NICS must "immediately contact": (i) "the criminal history repository or juvenile justice information system, as appropriate, of the State in which the person resides"; (ii) "the appropriate State custodian of mental health adjudication records in the State in which the person resides"; and (iii) "a local law enforcement agency of the jurisdiction in which the person resides." *Id.*

"[A]s soon as possible, but in no case more than 3 business days" after the licensed dealer contacted NICS, NICS must inform the dealer whether it may proceed with the sale, whether it must deny the sale, or whether cause exists for further investigation into potentially disqualifying records. 34 U.S.C. § 40901(*l*)(2). If NICS does not follow up within three business days, the dealer may proceed with the sale.

---

[2] *See* Jonathan H. Duff, Cong. Research Serv. R47310, *Bipartisan Safer Communities Act (P.L. 117-159): Section-by-Section Summary* 1 (2022), https://crsreports.congress.gov/product/pdf/R/R47310.

*See* 18 U.S.C. § 922(t)(1)(C)(ii). If NICS notifies the dealer within three business days that cause exists for further investigation, the dealer may proceed with the sale if (i) NICS follows up and informs the dealer that it may proceed with the sale, or (ii) 10 business days have elapsed since the dealer first contacted the NICS system and NICS has not informed the dealer that it must deny the sale—whichever occurs first. *See id.* § 922(t)(1)(C)(iii); 34 U.S.C. § 40901(*l*)(3).[3]

**3.** Since 1998, NICS background checks have resulted in over 2.2 million denials of firearm transfers to prohibited persons. *See* FBI, *Federal Denials*, https://perma.cc/B4BC-LBLG. As of June 2023, the FBI had denied more than 200 firearms transfers solely as a result of its expanded background check provisions—*i.e.*, after the initial database search revealed no responsive records—a number that has only increased since that time. *See* Dep't of Justice, *Fact Sheet: Update on Justice Department's Ongoing Efforts to Tackle Gun Violence* (June 14, 2023), https://perma.cc/W8H2-ZJLT.

### B.   Factual Background and Prior Proceedings

**1.** Plaintiffs Ethan McRorey and Kaylee Flores, along with two advocacy organizations, brought this suit alleging they are "law-abiding person[s]" under the age of 21 "who [are] eligible to possess firearms in the State of Texas and eligible to

---

[3] State law may impose additional requirements or prohibitions on the sale, transfer, or possession of firearms beyond what federal law requires. *See generally* Giffords Law Center, *Browse State Gun Laws*, https://perma.cc/D3QL-8Y5W.

purchase shotguns and rifles under federal law" from federally licensed dealers. *See* ROA.9.

On May 12, 2023, plaintiffs filed a complaint and moved for a preliminary injunction, requesting that the district court enjoin the federal government from implementing or enforcing the Act's background-check provisions nationwide. *See* ROA.8; ROA.114.  In support of that request, plaintiffs asserted that, earlier that same day—May 12, 2023—Mr. McRorey and Ms. Flores had each "attempted to purchase a . . . shotgun" in Texas from a federally licensed firearms dealer, the dealer had submitted their information to the NICS system, and they had been notified that they would be "contact[ed]" when the "process was completed."  ROA.32; *see* ROA.33-34.  According to plaintiffs, it violates the Second Amendment to require them to "wait while the government determines" whether they are prohibited from possessing a firearm.  ROA.130; *see* ROA.28.

**2.**  In opposing plaintiffs' motion, the government submitted a declaration from a custodian of records for the NICS system.  ROA.223.  The declaration explained that NICS records showed that the background-check process for Mr. McRorey's attempted May 12th purchase was completed on May 17, 2023; that "no prohibiting or potentially prohibiting information" was found; and that NICS had informed the dealer on that date that it could proceed with the sale.  *See* ROA.224-25. With respect to the background check for Ms. Flores's attempted May 12th purchase, NICS records showed that Ms. Flores's background-check was still pending as of the

date the government opposed plaintiffs' preliminary injunction motion on May 22, 2023, and that, by operation of the Act, the licensed dealer would be permitted to complete the sale to Ms. Flores as of May 27, 2023 (10 business days from the date of her attempted purchase) if NICS did not respond before that date with a final eligibility determination. *See* ROA.225.

**3.** The district court denied plaintiffs' preliminary injunction motion on August 14, 2023, concluding that plaintiffs had failed to establish a likelihood of success on the merits of their facial Second Amendment claim.

The district court explained that the Supreme Court has "reiterated that laws barring the mentally ill and felons from possessing firearms are constitutional." ROA.302; *see* ROA.300 (first citing *District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008); and then citing *McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010)). And in *New York State Rifle & Pistol Ass'n v. Bruen*, the Supreme Court specifically explained that it was not calling into question licensing regimes under which applicants must, for example, "undergo a background check" to determine whether the individual is a prohibited person who may not lawfully possess and carry arms. *See* ROA.301-02 (quoting *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022)). In light of the Supreme Court's statements, the district court rejected plaintiffs' argument that "*any* waiting period" for a background check to be completed facially violates the Second Amendment. ROA.302. The court further recognized that although a background-check process could be sufficiently "lengthy" as to deny the Second

8

Amendment right, plaintiffs here had not shown that the Act's "potential ten-business-day waiting period" while a background check is pending is so severely lengthy as to facially infringe the Second Amendment.  ROA.301-03.

## SUMMARY OF ARGUMENT

The district court correctly denied plaintiffs' preliminary injunction motion because plaintiffs have no likelihood of success on the merits.  Plaintiffs contend that "any delay at all" on the commercial purchase of a firearm while a background check remains pending facially violates the Second Amendment, *see* ROA.377, but the Second Amendment does not entitle plaintiffs to purchase a firearm instantaneously from a commercial dealer without any regulatory requirements designed to ensure the sale is lawful.  Thus, in *New York State Rifle & Pistol Ass'n v. Bruen*, the Supreme Court explicitly contrasted regulatory measures such as "background check[s]" from requirements that "prevent" the exercise of Second Amendment rights.  597 U.S. 1, 38 n.9 (2022).  The Supreme Court in *Bruen* did not "rule out" the possibility that such a regulatory measure might infringe the Second Amendment if it is "put toward abusive ends."  *Id.*  But as the district court here explained, plaintiffs have not established that the at most 10-business-day wait on the commercial purchase of a firearm required under the Act while a background check remains pending reflects the sort of "abusive" or "exorbitant" burden that *Bruen* suggested might present constitutional concern.  *Id.*

Although this Court need go no further to affirm the district court, "this Nation's historical tradition of firearm regulation" further demonstrates that the Second Amendment does not prevent legislatures from requiring reasonable background-check measures. *Bruen*, 597 U.S. at 17. History and tradition demonstrate that legislatures may permissibly disarm certain classes of individuals whose firearm possession presents a danger to themselves and the community. Background-check measures such as the one at issue here are an essential means for the government to determine whether an individual falls within such a class before they are permitted to purchase a firearm and are thus an important means of enforcing prohibitions that are themselves historically supported. Historical analogues confirm the challenged provisions comport with the Second Amendment. Indeed, in the earliest years of the Republic, legislatures disarmed certain groups and enacted regulatory measures designed to determine which of their citizens fell within those groups and could therefore be properly disarmed. The background-check provisions at issue here are particularly permissible because they apply only to individuals under the age of 21—an age group legislatures historically restricted from purchasing arms.

The remaining preliminary injunction factors also do not favor plaintiffs. In seeking a preliminary injunction, plaintiffs asserted they faced irreparable harm from having to wait while a background check remained pending for their attempted firearms purchases on May 12, 2023. But Mr. McRorey's background check for that

10

attempted purchase was completed on May 17, 2023—three business days later—and although the background check for Ms. Flores was still pending at the time the government opposed plaintiffs' preliminary injunction motion on May 22, 2023, by operation of law, the federally licensed dealer would have been able to complete the transfer to Ms. Flores as of May 27, 2023 (10 business days from her attempted purchase) if NICS had not responded sooner with a final eligibility determination. *See* ROA.224-25. Any irreparable harm plaintiffs allegedly suffered as a result of the Act by having to wait in connection with that attempted purchase has therefore long passed. In any event, even if plaintiffs could establish irreparable injury as a result of having to wait at most 10 business days for a future firearm purchase while a background check is pending, any such harm does not outweigh the harm to the government and the public if the challenged provisions were enjoined. An injunction would necessarily impair the government's ability to prevent attempted purchases by prohibited persons, increasing the likelihood firearms will be obtained by prohibited persons who might misuse them. Congress passed the Act's background-check requirements on a bipartisan basis to reduce precisely that risk and the irreparable consequences that can result.

## STANDARD OF REVIEW

This Court "review[s] a district court's denial of a preliminary injunction for an abuse of discretion." *Moore v. Brown*, 868 F.3d 398, 402 (5th Cir. 2017). To obtain a preliminary injunction, a movant must show "(1) a substantial likelihood of success on

the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest." *Id.* at 402-03. The district court's "[f]actual findings are reviewed for clear error, while legal conclusions are reviewed de novo." *Id.* at 403.

## ARGUMENT

## THE DISTRICT COURT CORRECTLY DENIED A PRELIMINARY INJUNCTION

### A.     Plaintiffs Have No Likelihood of Success on the Merits

On the same day that plaintiffs sought to purchase a firearm from a federally licensed dealer and their information was submitted to NICS for a background check, plaintiffs filed this suit and moved for a preliminary injunction arguing that it facially violates the Second Amendment to require them to "wait while the government determines" whether they are prohibited from possessing a firearm. ROA.130. The district court correctly held that plaintiffs have no likelihood of success on that claim.

Even assuming the Second Amendment extends to 18-to-20-year-olds, the Second Amendment does not entitle plaintiffs to purchase a firearm instantaneously from a commercial dealer without any regulatory requirements designed to ensure the sale is lawful. Thus, in *New York State Rifle & Pistol Ass'n v. Bruen*, the Supreme Court specifically explained that requirements to "undergo a background check" do not generally impair the exercise of Second Amendment rights. 597 U.S. 1, 38 n.9 (2022).

For this reason, plaintiffs cannot meet their burden of showing their proposed course of conduct falls within "the Second Amendment's plain text." *Id.* at 17. And in all events, "this Nation's historical tradition of firearm regulation" confirms that background-check requirements such as the one at issue here comport with the Second Amendment. *Id.*

### 1. The Second Amendment Does Not Entitle Plaintiffs to Commercially Purchase a Firearm Instantaneously Without a Background Check

**a.** The Second Amendment protects the right "to keep and bear [a]rms," U.S. Const. amend. II, but "[l]ike most rights, the right secured by the Second Amendment is not unlimited," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008). The Supreme Court has consistently described the right as belonging only to "law-abiding, responsible citizens," *id.* at 635, and has provided a non-exhaustive list of regulations, including "longstanding prohibitions on the possession of firearms by felons and the mentally ill" and "conditions and qualifications on the commercial sale of arms," that comport with the right to bear arms, *id.* at 626, 627 & n.26; *see Bruen*, 597 U.S. at 70 (reaffirming that the right is "subject to certain reasonable, well-defined restrictions").

Consistent with this understanding of the right, the Supreme Court has approved of regulatory measures such as "background check[s]" that are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9. In *Bruen*, the Court held unconstitutional New York's "may issue" licensing regime for public-carry licenses,

concluding that the State's requirement that applicants show a "special need for self-defense" "prevent[ed] law-abiding citizens" from exercising their right to public carry. *Id.* at 14, 71. But the Court explicitly contrasted that measure from the "shall-issue" licensing regimes of the majority of States that require applicants to (for example) "undergo a background check or pass a firearms safety course." *Id.* at 38 n.9. Such regimes, the Court explained, are permissible because "they do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry." *Id.* (quotation marks omitted). In his concurring opinion, Justice Kavanaugh, joined by Chief Justice Roberts, reiterated that such regimes are "constitutionally permissible." *See id.* at 80 (Kavanaugh, J., concurring); *see also Vincent v. Garland*, 80 F.4th 1197, 1201 (10th Cir. 2023) (recognizing the Supreme Court appears to have "approved the constitutionality of regulations requiring criminal background checks").

The background-check provisions that plaintiffs challenge here fit comfortably within the regulatory measures the Supreme Court has approved. The challenged provisions merely supplement the background-check process that is already required under the Brady Act for commercial firearms sales from federally licensed dealers to require that NICS "immediately contact" three additional sources when a prospective purchaser is under the age of 21 to determine whether the individual has a disqualifying juvenile justice or mental health record that would prohibit the sale. *See* 34 U.S.C. § 40901(*l*)(1); 18 U.S.C. § 922(t)(1)(C). Specifically, NICS must

14

"immediately contact": (i) "the criminal history repository or juvenile justice information system, as appropriate, of the State in which the person resides"; (ii) "the appropriate State custodian of mental health adjudication records in the State in which the person resides"; and (iii) "a local law enforcement agency of the jurisdiction in which the person resides." 34 U.S.C. § 40901(*l*)(1).

Thus, like the background-check process required under the Brady Act for commercial firearms purchases generally, the background-check process required under the Act is a "condition[]" on the "commercial sale of arms," *Heller*, 554 U.S. at 626-27, 627 & n.26; that is intended to "ensure only that those" purchasing arms from federally licensed dealers are, "in fact, law-abiding" citizens without a disqualifying record that would prohibit the sale, *Bruen*, 597 U.S. at 38 n.9 (quotation marks omitted). The challenged provisions do not raise any Second Amendment concern. *Id*; *see also id*. at 80 (Kavanaugh, J., concurring).

The Supreme Court in *Bruen* did not "rule out" the possibility that an otherwise lawful regulatory measure might infringe the Second Amendment if it were "put toward abusive ends." *See* 597 U.S. at 38 n.9. For example, if "lengthy wait times" are so severe as to effectively "deny ordinary citizens their right to" bear arms. *Id*.; *see also id*. at 80 (Kavanaugh, J., concurring). Here, however, the Act presents no such risk. Under the Act, if NICS has not followed up with the licensed dealer within three business days of an attempted purchase to indicate whether the sale may be completed, must be denied, or whether cause exists for further investigation, the

dealer is automatically permitted to complete the sale.  18 U.S.C. § 922(t)(1)(C)(ii).

Similarly, if NICS has informed the dealer within three business days that cause exists

for further investigation, but then does not follow up with a final eligibility

determination within 10 business days of the attempted purchase, the dealer is

automatically permitted to complete the sale.  *See id.* § 922(t)(1)(C)(iii).

Thus, by operation of law, the maximum duration a dealer must wait under the

Act while a background check remains pending is three business days—the same

maximum duration required under the Brady Act for commercial firearms sales to

individuals 21 and older—or, if NICS has informed the dealer that cause exists for

further investigation, 10 business days.  *See* 18 U.S.C. § 922(t)(1)(C).

The record here confirms the Act does not require any "abusive" wait time of

the type *Bruen* suggested might present a constitutional concern.  *See Bruen*, 597 U.S. at

38 n.9.  Plaintiff McRorey attempted to purchase a firearm from a federally licensed

dealer on May 12, 2023, and according to NICS records, his background check was

completed on May 17, 2023, three business days later.  *See* ROA.224-25.  Plaintiff

Flores also attempted to purchase a firearm from a federally licensed dealer on May

12, 2023, and although her background check was still pending as of the date the

government opposed plaintiffs' preliminary injunction motion, by operation of law,

the licensed dealer would have been permitted to complete the transfer to Ms. Flores

no later than May 27, 2023 (10 business days after her attempted purchase) if NICS

had not responded before that date with a final eligibility determination.  *See* ROA.225.

The district court correctly held that plaintiffs failed to establish that a wait of no more than three business days on the commercial purchase of a firearm while a background check remains pending—or no more than 10 business days if NICS determines cause exists for further examination—facially infringes the Second Amendment.  *See* ROA.301-03.

**b**.  Plaintiffs' contrary arguments are not persuasive.  Indeed, plaintiffs do not meaningfully engage with the Act's requirements or the Supreme Court's language in *Bruen*.

Plaintiffs primarily urge that 18-to-20-year-olds fall within the class of persons protected by the Second Amendment and therefore cannot be "disarm[ed]."  Br. 19 (quotation marks omitted); *see* Br. 8-20.  But the challenged provisions do not "disarm" anyone—the challenged provisions do not address firearm possession or use, nor do they prohibit individuals who may lawfully possess firearms from purchasing them from federally licensed dealers (much less from any other source, to whom the provisions do not apply).  As discussed above, the challenged provisions merely supplement the existing background-check process the Brady Act requires for commercial firearms sales to specify that NICS must "immediately contact" three additional sources when a prospective firearms purchaser is under the age of 21 to

17

investigate whether disqualifying juvenile records exist that would prohibit the sale under other laws that plaintiffs do not challenge here. *See* 34 U.S.C. § 40901(*l*)(1).

Plaintiffs assert that it violates the Second Amendment to impose an "indefinite waiting period" on their purchase of a firearm. Br. 1. But the Act is not a "waiting period" provision, it is a background-check measure, and the required process may be completed as soon as NICS receives responses from the relevant entities; the Act does not require any minimum delay between an attempted purchase and the transfer of a firearm. The maximum time for the process to be completed is also not "indefinite": as already explained, the maximum duration a dealer must wait to complete a sale is three business days, or, if NICS informs the dealer that cause exists for further investigation, 10 business days. *See supra* pp. 15-16.

Although plaintiffs do not meaningfully develop their Second Amendment argument, plaintiffs appear to contend (as they argued in district court) that it facially infringes the Second Amendment for the government to impose "any delay at all" on their commercial purchase of a firearm for a background check. ROA.377; *see also* ROA.130 (arguing it violates the Second Amendment to require them to "wait while the government determines they are not prohibited" from purchasing arms (emphasis omitted)). That argument lacks merit. The Second Amendment protects the right to "keep and bear arms," U.S. Const. amend. II; it does not entitle individuals to commercially purchase firearms instantaneously. Nor does it entitle individuals to keep and carry firearms without any regulatory requirements designed to ensure they

18

will not be misused. Thus, *Bruen* specifically contrasted regulatory measures such as requirements to "undergo a background check" from regulations that "prevent" the exercise of Second Amendment rights. *See* 597 U.S. at 38 n.9.

Plaintiffs' efforts to avoid *Bruen*'s language fail. Plaintiffs assert that *Bruen* focused on public-carry licensing, not requirements for the purchase of firearms. Br. 33-34. But *Bruen*'s reasoning is not limited to public-carry licensing; it reflects the conclusion that regulatory measures aimed at ensuring safe and lawful firearm ownership are constitutionally permissible because such measures generally do not "deny ordinary citizens their" right to keep and bear arms. *See Bruen*, 597 U.S. at 38 n.9; *see also id.* at 80 (Kavanaugh, J., concurring) (describing as "constitutionally permissible" licensing regimes that require applicants to undergo "a background check" and "training in firearms handling and in laws regarding the use of force"). If, as *Bruen* explains, requirements to "undergo a background check" or "pass a firearms safety course" to obtain a public-carry license do not generally "prevent" the exercise of the "Second Amendment right to public carry," *id.* at 38 n.9, plaintiffs cannot be correct that a background-check requirement on the commercial purchase of a firearm facially infringes the Second Amendment right to keep arms, Br. 33-34. That is particularly so given that, as discussed above, the challenged provisions apply only to sales from federally licensed dealers.

Plaintiffs' slippery-slope argument that the government could under the district court's reasoning impose any and "all manner of background checks" or "ban[]"

firearms entirely" similarly fails to engage with the Supreme Court's language. Br. 24-25 (emphasis omitted). *Bruen* recognized, as discussed above, that otherwise permissible regulatory measures may be "put toward abusive ends," and thus the Second Amendment may be implicated if, for example, "wait times" are so severely "lengthy" as to effectively deny the Second Amendment right. 597 U.S. at 38 n.9; *see also id.* at 80 (Kavanaugh, J., concurring) (recognizing there could be "as-applied challenge[s]"). Here, however, as the district court explained, plaintiffs have not shown that the at most 10-business-day wait required under the Act reflects the sort of "abusive" or "exorbitant" burden that *Bruen* suggested might present constitutional concern. *Id.* at 38 n.9.

Plaintiffs assert that some licensed dealers will not transfer a firearm even after the time period provided under the Act has lapsed because they have a store "policy" not to transfer a firearm unless they receive an explicit "approved" response from NICS. Br. 2-3; *see, e.g.*, ROA.17-18 (asserting that Walmart has a "policy not to transfer *any* firearm until receiving an affirmative 'approved' notification from NICS, regardless of how many days have elapsed"); ROA.97 (individual was "informed" by licensed dealer of their "policy not to complete [a] transfer" absent an affirmative "approved" response). But that discretionary policy decision by a third party is not traceable to any requirement of the Act and cannot form the basis of a Second Amendment claim. *See Turaani v. Wray*, 988 F.3d 313, 316-17 (6th Cir. 2021) (concluding individual lacked standing to sue federal government for firearms dealers'

failure to transfer a firearm where firearms dealer made "voluntary choice" in its "discretion" not to complete the sale (quotation marks omitted)).

For these reasons, the Fourth Circuit's recent decision in *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1040-42 (4th Cir. 2023), which held unconstitutional Maryland's "handgun qualification license" requirement, does not aid plaintiffs. That case was wrongly decided, for the reasons explained by the dissent. *See id.* at 1049-58 (Keenan, J., dissenting). In any event, the Maryland law at issue in *Moore* was far more restrictive than the provisions at issue here, requiring individuals to obtain a permit—subject to requirements including a firearms safety course and an up to 30-day background check—before being permitted to undergo a separate, up to seven-day background check under state law to complete the transfer. *Id.* at 1043 & n.7. The panel in *Moore* thus reasoned that the Maryland law "cut[] off" for up to 30 days an individual's ability to obtain a handgun from any source, whether by "sale, rental, or gift." *Id.* at 1043. The challenged provisions, by contrast, which apply only to commercial sales from federally licensed dealers and require dealers to wait at most 10 business days, impose no similar burden.

Finally, plaintiffs erroneously contend (Br. 5-6) that the burden is on the government to prove that the challenged provisions are constitutional. That would improperly invert the customary burden on plaintiffs to establish their entitlement to a preliminary injunction and the general presumption of constitutionality that attaches to federal statutes. *See Seoane v. Ortho Pharms., Inc.*, 660 F.2d 146, 151 (5th Cir. 1981)

21

(noting "the presumption of constitutionality of legislative acts"). For the reasons explained above, plaintiffs' failure to demonstrate that the challenged provisions meaningfully impair their ability to keep and bear arms forecloses their facial Second Amendment claim.

### 2.    Historical Tradition Confirms the Challenged Provisions are Lawful

Because plaintiffs have not established the challenged provisions meaningfully impair their ability to keep and bear arms, this Court need go no further to affirm the denial of plaintiffs' motion for a preliminary injunction. In all events, "this Nation's historical tradition of firearm regulation," *Bruen*, 597 U.S. at 17, demonstrates that the Second Amendment does not prevent legislatures from requiring reasonable background-check measures to ensure that firearms are possessed only by "law-abiding, responsible citizens," *id.* at 38 n.9 (quoting *Heller*, 554 U.S. at 635). That is particularly so with respect to the age group at issue here—those under the age of 21—an age group that legislatures have historically restricted from purchasing arms.

**a.** Background-check measures such as the one at issue here comport with precedent, history, and tradition. As this Court has recognized, and as plaintiffs do not dispute, history and tradition confirm that legislatures may disarm certain classes of individuals whose firearm possession presents a danger to themselves and the community. *See United States v. Daniels*, 77 F.4th 337, 353 (5th Cir. 2023) (recognizing that historical tradition reflects "a public understanding that when a class of

individuals was thought to pose a grave danger to public peace, it could be disarmed"); *see also, e.g.*, *United States v. Jackson*, 69 F.4th 495, 504 (8th Cir. 2023) ("Legislatures historically prohibited possession by categories of persons based on a conclusion that the category as a whole presented an unacceptable risk of danger if armed."). That includes, for example, "longstanding prohibitions on the possession of firearms by felons and the mentally ill." *Heller*, 554 U.S. at 626.

The challenged provisions, together with the Brady Act's background-check requirements, are an essential means for the government to *determine* whether an individual falls within such a group before they are permitted to purchase a firearm from a federally licensed dealer and are thus an important means of enforcing prohibitions that are themselves "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. As explained above, *Bruen* confirms that the Second Amendment does not prohibit legislatures from enacting such reasonable regulatory measures. *Id.* at 38 n.9.

"[H]istorical analogue[s]" further confirm the challenged provisions comport with the Second Amendment. *Bruen*, 597 U.S. at 30 (quotation marks omitted). At the start of the Revolutionary War, the Continental Congress recommended, and many States enacted, laws disarming loyalists and those "notoriously disaffected to the cause of America." 4 *Journals of the Continental Congress* 1774-1789, at 205 (Worthington Chauncey Ford ed. 1906) (record of Mar. 14, 1776). To effectuate these measures, legislatures enacted regulatory requirements that were designed to determine which of

their citizens fell within these groups.  Thus, in 1777, Pennsylvania passed a law

requiring "male white inhabitants of" the state to "take and subscribe" to an oath of

loyalty before a justice of the peace; the law provided that the justices of the peace

were to "keep fair registers of the names and surnames of the persons so sworn or

affirmed" and persons who had refused the oath were to be "disarmed."[4]  Virginia

enacted a materially identical law that same year.[5]  Similarly, a 1776 Massachusetts law

required "every male person" to take a loyalty oath and provided that those refusing

the oath could be made to appear before a justice of the peace "to answer to such

information, and to show cause . . . why he should not be disarmed."[6]  Other similar

measures were enacted in Connecticut (1775), Rhode Island (1776), North Carolina

(1777), and New Jersey (1777).[7]

These laws are "relevantly similar" to the challenged background-check

provisions with respect to "why" they were enacted: to permit the government to

---

[4] *See* Act of June 13, 1777, ch. 756, *in* 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 110-13 (1903).

[5] *See* Act of May 1777, ch. 3, in 9 *The Statutes at Large, Being a Collection of All the Laws of Virginia, from the First Session of the Legislature, in the Year 1619*, at 281-83 (William Waller Hening ed. 1821).

[6] Act of May 1, 1776, ch. 21, §§ 1-2, *in* 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479-81 (1886).

[7] Act of Dec. 1775, *in The Public Records of the Colony of Connecticut From May, 1775, to June, 1776, inclusive* 192-95 (Charles J. Hoadly ed., 1890); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (John Russell Bartlett ed., 1862); Act of 1777, ch. 6, § 9, *in* 24 *The State Record of North Carolina* 89 (Walter Clark ed., 1905); Act of Sept. 20, 1777, ch. 40, § 20, *in Acts of the General Assembly of the State of New-Jersey* 90 (1777).

distinguish between those citizens whose firearm possession was lawful and those that could be properly disarmed. *See Bruen*, 597 U.S. at 28-29. They also share relevant similarities to the challenged provisions with respect to "how" they operated: by placing an incidental regulatory burden on "all or at least a large portion of gunowners" to permit the government to make such distinctions and thus ensure that firearms are kept only by "law-abiding, responsible citizens." *See United States v. Libertad*, --- F. Supp. 3d ---, 2023 WL 4378863, at *7 (S.D.N.Y. July 7, 2023) (quoting *Bruen*, 597 U.S. at 38 n.9).

Such laws were enacted against a backdrop of colonial and early state laws that—like the provisions at issue here—regulated the sale and transfer of arms to ensure public safety. *See Libertad*, 2023 WL 4378863, at *7 (recognizing the "expansive authority" colonial and early state legislatures exercised "over the transfer of firearms between individuals"); *see also Teixeira v. County of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (en banc) (discussing colonial-era restrictions on the transfer and sale of arms). This included, for example, requirements for the licensing and inspection of gunpowder before it could be exported or sold;[8] and requirements that

---

[8] *See, e.g.*, Act of 1651, *in The Colonial Laws of Massachusetts* 125-26 (1887) (requiring that individuals obtain a "[l]icense . . . from some two of the Magistrates" to export gunpowder); Act of Apr. 18, 1795, ch. 1857, *in The Statutes at Large of Pennsylvania from 1682 to 1801*, at 346-52 (requiring gunpowder manufactured or imported for sale to be deposited in public magazine and to be inspected and marked).

state inspectors test and mark gun barrels before they could be sold or purchased.[9]

Moreover, as the firearms industry evolved during the 19th century and guns became

more lethal and widely available, legislatures began enacting regulations that—as a

precursor to the background-check measures of today—explicitly required

commercial firearms sellers to obtain certain identifying information from purchasers

and maintain a record for future inspection.[10]

Plaintiffs insist that historical regulations did not operate in the same manner as

modern background-check requirements.  *E.g.*, Br. 27.  But *Bruen* made clear that

modern firearms laws can comply with the Second Amendment even if they lack a

"historical twin."  *See* 597 U.S. at 302 (emphasis omitted).  There are, moreover, many

reasons other than constitutional limitations that historical regulations are not a "dead

ringer" for modern background checks.  *Id.*  During the Founding era, guns in

America were "produced laboriously, one at a time," Pamela Haag, *The Gunning of*

---

[9] *See* Act of Mar. 8, 1805, ch. 81, *in The General Laws of Massachusetts* 105-06 (Theron Metcalf ed. 1823) (requiring gun barrels to be proved and marked before sale and penalizing the sale or purchase of any gun that had not been marked and proved); Act of Mar. 10, 1821, ch. 167, *in Laws of the State of Maine* 546 (1830) (requiring gun barrels to be "proved, marked and certified" before sale).

[10] *See* Act of Apr. 16, 1881, 1881 Ill. Laws 73, 73-74 (requiring all commercial sellers of "deadly weapons" to "keep a register of all such weapons sold or given away by them," along with the "date" of the sale, "the name and age of the person to whom the weapon is sold or given," and "the purpose for which [the weapon] is purchased or obtained," which was to be open for public inspection); Act of July 13, 1892, ch. 159, 27 Stat. 116, 116-17 (1893) (requiring firearms sellers in the District of Columbia to "keep a written register of the name and residence of every purchaser," which was to be subject to inspection by the police).

*America* 9 (2016);[11] and communities were "close-knit," where "[e]veryone knew everyone else," *Range v. Attorney Gen. U.S.*, 69 F.4th 96, 117 (3d Cir. 2023) (en banc) (Krause, J., dissenting) (quoting Stephanos Bibas, *The Machinery of Criminal Justice* 2 (2012)). That is substantially different from today, where guns may be mass-produced quickly and are widely available for purchase at large commercial retailers that are unlikely to know their customers. *E.g.*, ROA.18. The classes of persons who were prohibited from bearing arms also differed in the Founding era, *e.g.*, *Jackson*, 69 F.4th at 503, as did record keeping. The Supreme Court explained in *Bruen* that such historical differences do not impose "a regulatory straightjacket," constraining legislatures to only those types of regulatory measures that existed in the 18th century. *See* 597 U.S. at 30.

**b.** The background-check provisions at issue here are particularly permissible because they apply only to individuals under the age of 21, an age group that legislatures historically prohibited from purchasing arms. At a minimum, this historical tradition confirms that it does not infringe the Second Amendment to require such individuals to wait at most 10 business days while a background check remains pending on their commercial purchase of a firearm.

At the time of the Founding, "[t]he age of majority at common law was 21," and individuals under that age were classified as "minor[s]" or "infant[s]." *National*

---

[11] *See also, e.g.*, Merritt Roe Smith, *Harpers Ferry Armory and the New Technology* 86-101 (1980).

*Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms & Explosives (NRA)*, 700

F.3d 185, 201 (5th Cir. 2012), *abrogated on other grounds by Bruen*, 597 U.S. 1; *see* 1

William Blackstone, *Commentaries on the Law of England* 451 (1765) ("So that full age in

male or female, is twenty one years . . . who till that time is an infant, and so styled in

law.").  Following that common law approach, the "American colonies, then the

United States, adopted age twenty-one as the near universal age of majority."  Vivian

E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55, 64 (2016); *see* 2 James

Kent, *Commentaries on American Law* 191 (1827) (confirming that "the inability of

infants to take care of themselves . . . continues, in contemplation of law, until the

infant has attained the age of twenty-one years"); *see also, e.g.*, *James Madison's Notes of*

*the Constitutional Convention, August 7, 1787*, Yale L. Sch. Avalon Project (letter of

Gouverneur Morris) (warning that under-21-year-olds "want prudence" and "have no

will of their own").[12]

As firearms evolved in the 19th century, at least "nineteen States and the

District of Columbia . . . enacted laws expressly restricting the ability of persons under

21 to purchase or use particular firearms."  *NRA*, 700 F.3d at 202 & n.14.  As early as

1856, Alabama forbade providing "to any male minor" any "air gun or pistol," Act of

Feb. 2, 1856, no. 26, § 1, 1856 Ala. Acts 17; and "[a]t that time, the age of majority in

Alabama was twenty-one-years," *National Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1325

---

[12] https://perma.cc/QJ7B-D4J4.

(11th Cir.), *reh'g en banc granted, vacated*, 72 F.4th 1346 (11th Cir. 2023). A "flurry" of similar laws followed in the decades surrounding the passage of the Fourteenth Amendment. *See id.* at 1327. An 1875 Indiana law, for example, made it a crime "for any person to sell, barter, or give to any other person, under the age of twenty-one years, any pistol" or similar deadly weapon. *See* Act of Feb. 27, 1875, ch. 40, § 1, 1875 Ind. Laws 59.

Similar age-based restrictions were enacted in numerous other jurisdictions across the country, including Tennessee (1856), Kentucky (1859), Delaware (1881), the District of Columbia (1892), Illinois (1881), Iowa (1884), Kansas (1883), Louisiana (1890), Maryland (1882), Mississippi (1878), Missouri (1879), Oklahoma (1890), North Carolina (1893), Texas (1897), West Virginia (1882), Wisconsin (1883), and Wyoming (1890).[13] Such prohibitions thus spanned every region of the country and covered much of the population.

---

[13] Act of Feb. 26, 1856, ch. 81, § 2, 1856 Tenn. Acts 92, 92; Ky. Gen. Stat. ch. 29, art. 29, § 1, at 359 (Edward I. Bullock & William Johnson eds. 1873); Act of Apr. 8, 1881, ch. 548, § 1, 16 Del. Laws 716, 716; Act of July 13, 1892, ch. 159, § 5, 27 Stat. at 117 (D.C.); Act of Apr. 16, 1881, § 2, 1881 Ill. Laws at 73; Act of Mar. 29, 1884, ch. 78, § 1, 1884 Iowa Acts 86, 86; Act of Mar. 5, 1884, ch. 105, §§ 1-2, 1883 Kan. Sess. Laws 159, 159; Act of July 1, 1890, no. 46, § 1, 1890 La. Acts 39, 39; Act of May 3, 1882, ch. 424, § 2, 1882 Md. Laws 656, 656; Act of Feb. 28, 1878, ch. 46, § 2, 1878 Miss. Laws 175; Mo. Rev. Stat. § 1274 (1879); Okla. Stat. ch. 25, art. 47, § 3 (1891); Act of Mar. 6, 1893, ch. 514, § 1, 1893 N.C. Pub. Laws 468, 468; Act of May 14, 1897, ch. 155, § 1, 1897 Tex. gen. Laws 221, 221-22; Act of Mar. 29, 1882, ch. 135, § 1, 1882 W. Va. Acts 421, 421-22; Act of Apr. 3, 1883, ch. 329, § 2, 1883 Wiss. Sess. Laws 290, 290; Act of Mar. 14, 1890, ch. 73, § 97, 1890 Wyo. Sess. Laws 127, 140.

The prohibitions were widely recognized and approved by courts and commentators.  "[T]he judge and professor Thomas Cooley, who wrote a massively popular 1868 Treatise on Constitutional Limitations," *Heller*, 554 U.S. at 616, included among the permissible exercises of the state police power "[t]hat the State may prohibit the sale of arms to minors," Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883); *see Heller*, 554 U.S. at 616-17 (treating Cooley's interpretation of the Second Amendment as persuasive authority).  Likewise, in what appears to be the sole 19th century judicial decision addressing these prohibitions, the Tennessee Supreme Court upheld a state law outlawing the sale of pistols to individuals under the age of 21.  *See State v. Callicutt*, 69 Tenn. 714, 716-17 (1878).  "[T]he fact that there was apparently only a single challenge to these [restrictions'] constitutionality until well into the twentieth century" further illustrates that the public "considered the statutory prohibitions constitutionally permissible."  *Bondi*, 61 F.4th at 1330.

This history and tradition demonstrates that legislatures may permissibly restrict 18-to-20-year-olds from commercially purchasing arms altogether, as the government has explained in *Reese v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 23-30033 (5th Cir.) (argued Nov. 6, 2023).  But in all events, that numerous legislatures across the country enacted laws in the 19th century to restrict under-21-year-olds' access to firearms in the interest of "public safety," *Bondi*, 61 F.4th at 1326, at a minimum confirms that it does not facially offend the Second Amendment to

require such individuals to wait at most 10 business days while a background check remains pending for their commercial purchase of a firearm from a federally licensed dealer.

**B.    The Remaining Equitable Factors Tilt Sharply Against Relief**

The remaining preliminary injunction factors also do not favor plaintiffs.

As an initial matter, plaintiffs have failed to establish ongoing irreparable harm to justify the extraordinary relief they seek.  Plaintiffs moved for a preliminary injunction on May 12, 2023, alleging that Mr. McRorey and Ms. Flores had each attempted to purchase a firearm that same day but had been required to "wait while the government determine[d]" whether they were prohibited from making the purchase.  *See* ROA.130.  As discussed above, however, Mr. McRorey's background check was completed on May 17, 2023, clearing the way under federal law for the dealer to complete the purchase; and although the background check for Ms. Flores had not yet been completed at the time the government opposed plaintiffs' preliminary injunction motion, by operation of law, the licensed dealer would have been able to complete the transfer to Ms. Flores as of May 27, 2023 (10 business days from her attempted purchase).  *See* ROA.224-25.  Plaintiffs suggest that as of August 3, 2023, Ms. Flores still had not "received" the firearm she attempted to purchase.  Br. 43 (quoting ROA.298).  But plaintiffs do not explain why that is so or how it is traceable to any requirement of the Act (rather than, for example, the independent actions of the third-party dealer or of Ms. Flores herself, *see supra* p. 20).

31

Thus, any irreparable harm plaintiffs allegedly suffered as a result of the Act by having to "wait" for their commercial purchase of a firearm (ROA.130) has long passed. Plaintiffs vaguely assert that they will again "attempt to purchase firearms before reaching the age of 21." ROA.39; *see also, e.g.*, ROA.262. But those "some day intentions" do not establish an ongoing threat of irreparable injury sufficient to justify the extraordinary relief of a preliminary injunction. *See Deutsch v. Travis Cty. Shoe Hosp. Inc.*, 721 F. App'x 336, 340 (5th Cir. 2018) (quotation marks omitted). And contrary to plaintiffs' suggestion, *e.g.*, Br. 42, the mere fact that they claim a constitutional violation "does not release [them] from their burden of showing" an imminent irreparable injury. *See Morehouse Enters., LLC v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 78 F.4th 1011, 1017 (8th Cir. 2023).

In all events, even if plaintiffs could establish irreparable harm as a result of having to wait at most 10 business days for a future firearms purchase while a background check is pending, any such harm does not outweigh the harm to the government and the public if the challenged provisions were enjoined. As discussed above, the challenged provisions were enacted to better ensure that firearms are not sold to prohibited persons whose possession of firearms presents a danger to themselves and the community. As of June 2023, the FBI had denied more than 200 firearms transactions solely as a result of the expanded background-check process, a number that has only increased since that time. *See supra* p. 6. An injunction would necessarily impair the government's ability to prevent such attempted purchases,

increasing the likelihood that firearms will be obtained by prohibited persons who might misuse them. Congress enacted the Act's requirements on a bipartisan basis to reduce precisely that risk and the irreparable consequences that can result.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

CHAD E. MEACHAM
*United States Attorney*

MICHAEL S. RAAB
 *s/ Courtney L. Dixon*
COURTNEY L. DIXON
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7246*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 353-8189*

December 2023

**CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system.

*s/ Courtney L. Dixon*
Courtney L. Dixon

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 8,401 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Courtney L. Dixon*

Courtney L. Dixon