No. 23-10837

# In the United States Court of Appeals
## for the Fifth Circuit

ETHAN MCROREY; KAYLEE FLORES; GUN OWNERS OF AMERICA, INCORPORATED; GUN OWNERS FOUNDATION,

*Plaintiffs-Appellants*,

v.

MERRICK GARLAND, U.S. ATTORNEY GENERAL; FEDERAL BUREAU OF INVESTIGATION,

*Defendants-Appellees*.

**Appeal from the United States District Court for the Northern District of Texas
United States District Court Judge Reed O'Connor, Civ. No. 7:23-cv-00047-O**

## PLAINTIFFS-APPELLANTS' REPLY BRIEF

Robert J. Olson
WILLIAM J. OLSON, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
(703) 356-5070
wjo@mindspring.com

Stephen D. Stamboulieh
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

Oliver M. Krawczyk
AMBLER LAW OFFICES, LLC
115 South Hanover Street, Suite 100
Carlisle, PA 17013
(717) 525-5822
oliver@amblerlawoffices.com

*Attorneys for Appellants Ethan McRorey, Kaylee Flores, Gun Owners of America, Incorporated and Gun Owners Foundation*

No. 23-10837

# In the United States Court of Appeals
## for the Fifth Circuit

ETHAN MCRORY; KAYLEE FLORES; GUN OWNERS OF AMERICA, INCORPORATED; GUN OWNERS FOUNDATION,

*Plaintiffs-Appellants*,

v.

MERRICK GARLAND, U.S. ATTORNEY GENERAL; FEDERAL BUREAU OF INVESTIGATION,

*Defendants-Appellees*.

**Appeal from the United States District Court for the Northern District of Texas**
**United States District Court Judge Reed O'Connor, Civ. No. 7:23-cv-00047-O**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

**Plaintiffs-Appellants:**

Ethan McRorey; Kaylee Flores; Gun Owners of America, Inc.*; Gun Owners Foundation*

**Counsel for Plaintiffs-Appellants:**

Robert J. Olson, William J. Olson, PC; Stephen D. Stamboulieh, Stamboulieh Law, PLLC; David G. Browne, Spiro & Browne, PLC; Brandon W. Barnett, Barnett Howard & Williams PLLC; Oliver M. Krawczyk, Ambler Law Offices, LLC

**Defendants-Appellees:**

Governmental parties are exempt from 5th Cir. R. 28.2.1.

**Counsel for Defendants-Appellees:**

Taisa M. Goodnature, Courtney Dixon, Steven H. Hazel, U.S. Department of Justice, Civil Division

* Pursuant to Fed. R. App. P. 26.1(a) and 5th Cir. R. 28.2.1, Gun Owners of America, Inc. and Gun Owners Foundation are non-stock, nonprofit corporations with no parent companies.  Therefore, no publicly held company owns 10% or more of their stock.

*/s/ Stephen D. Stamboulieh*
STEPHEN D. STAMBOULIEH

# TABLE OF CONTENTS

Certificate of Interested Persons .................................................................. i

Table of Authorities ..................................................................... v

Argument

I.   Defendants May Not Shirk Their Burden to Show a
     Historical Tradition that Justifies Waiting Periods on
     Firearm Purchases by Young Adults ............................................ 1

     A. Defendants Mischaracterize What the Supreme Court
        Did and *Did Not* Say .................................................... 1

        1.  Defendants Act as if Bruen Was Never Decided ................. 1

        2.  Defendants Fail to Explain Why Supreme Court Dicta
            Should Be Elevated over the Court's Express Holdings ....... 3

        3.  Defendants Repeatedly Misconstrue the Supreme Court's
            Statements .................................................................. 4

     B. Defendants Minimize the Waiting Periods the
        Challenged Provisions Impose .................................................. 8

     C. Defendants Insist on Applying Repudiated Interest
        Balancing Throughout Their Brief .......................................... 11

II.  Defendants Fail to Establish an Early American
     Tradition of Distinctly Similar Firearm Regulation .................... 16

     A. Defendants' Purported Background-Check Analogues
        Fail to Support the Challenged Provisions .............................. 18

        1. Loyalty Oaths .................................................................. 18

2. Defendants' Remaining Purported Analogues Are Similarly
Unhelpful…………………………………………………………..22

B. Defendants Evince No Founding-Era Restrictions on
Young Adults' Second Amendment Rights .............................25

III. Defendants Fail to Engage with Plaintiffs' Continuing
Irreparable Harms ......................................................30

IV. Defendants' Attempt to Dispense with the Equitable Factors
Falls Flat ..................................................................31

Conclusion ........................................................................32

# TABLE OF AUTHORITIES

U.S. CONSTITUTION

Amendment II ............................................................................. 4, *passim*

Amendment XIV ...................................................................................... 27

STATUTES

18 U.S.C. § 845(a)(4) ............................................................................. 23

18 U.S.C. § 922 ............................................................................... 19, 27

REGULATIONS

27 C.F.R. § 478.124(c)(1) ....................................................................... 19

CASES

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................... *passim*

*Elrod v. Burns*, 427 U.S. 347 (1976) ................................................. 9, 30

*Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020) ........... 25, 28

*Jackson Women's Health Org. v. Currier*, 760 F.3d 448
    (5th Cir. 2014) ................................................................................ 31

*Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) ................................. 6, 7, 24

*Md. Shall Issue, Inc. v. Moore*, 86 F.4th 1038 (4th Cir. 2023) .............. 15

*McDonald v. City of Chicago*, 561 U.S. 742 (2010) ........................... 12, 13

*N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ... *passim*

*Nken v. Holder*, 556 U.S. 418 (2009) ........................................................ 31

*NRA v. BATFE*, 714 F.3d 334 (5th Cir. 2013) ................................... 6, 16

*NRA v. Bondi*, 61 F.4th 1317 (11th Cir. 2023) .......................... 27, 28, 29

*Printz v. United States*, 521 U.S. 898 (1997) ........................................ 9

*Range v. Att'y Gen.*, 69 F.4th 96 (3d Cir. 2023) ...................................... 6

*Schenck v. United States*, 249 U.S. 47 (1919) ....................................... 21

*Speiser v. Randall*, 357 U.S. 513 (1958) ............................................... 21

*State v. Callicutt*, 69 Tenn. 714 (1878) ................................................. 28

*Teixeira v. County of Alameda*, 873 F.3d 670 (9th Cir. 2017) .......... 22, 23

*United States v. Rahimi*, 61 F.4th 443 (5th Cir. 2023) ...................... 7, 17

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943) ................... 21

*Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021) ..................................... 14

MISCELLANEOUS

1806 Ky. Acts 122 ...................................................................................... 23

1811 N.J. Laws 300 .................................................................................... 23

Acts and Resolves of Massachusetts: 1804-1805 (Mar. 8, 1805) ............ 24

*Admission of States to the Union: A Historical Reference Guide*, Cong. Rsch. Serv. 4 tbl.1 (Dec. 5, 2023) .................................................... 28

"An Act to Provide for the Storing and Safe Keeping of Gun Powder in the Town of Boston, and to Prevent Damage from the Same," 1801 Mass. Acts 507 ....................................................................... 23

*ATF Explosives Industry Newsletter*, <u>ATF</u>, at 1 (June 2013) ................. 23

*Black Powder*, <u>ATF</u> (Sept. 2, 2022) ......................................................... 23

J. Bonnett, *Police: Patterson Woman Fatally Shoots Intoxicated Man Trying to Break into Home*, <u>CBS News</u> (Sept. 25, 2022) ............... 11

P. Chiaramonte, *'No One Helped Her': NJ Woman Murdered by Ex While Awaiting Gun Permit*, <u>Fox News</u> (Jan. 12, 2017) ................ 11

139 Cong. Rec. 30567-613 ......................................................................... 8

7 William Waller Hening, <u>The Statutes at Large; a Collection of all the Laws of Virginia</u> 35 (1820) ............................................................. 20

J. Lott, *In Second District Race, a Real Difference in How to Battle Terror*, <u>StarTribune</u> (Sept. 29, 2016) ............................................. 12

NSSF, *What Happens When Ammo Burns? Sporting Ammunition and the Fire Fighter*, <u>YouTube</u> (Nov. 28, 2012) .................................... 23

Matthew E. Thomas, <u>Historic Powder Houses of New England: Arsenals of American Independence</u> (2013) .................................................. 23

Transcript of Oral Argument at 5-8, *United States v. Rahimi*, No. 22-915 (Nov. 7, 2023) .......................................................................... 7

## ARGUMENT

I.    **Defendants May Not Shirk Their Burden to Show a Historical Tradition that Justifies Waiting Periods on Firearm Purchases by Young Adults.**

### A. Defendants Mischaracterize What the Supreme Court Did and *Did Not* Say.

#### 1. *Defendants Act as if Bruen Was Never Decided.*

Although *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) ("*Bruen*"), is hardly a dated opinion, Defendants already forget its key holding – that *they* and *they alone* bear the burden of justifying a presumptively <u>un</u>constitutional firearm statute.  Incredibly, Defendants claim the opposite – that Plaintiffs "erroneously contend[ed] … that the burden is on the government to prove that the challenged provisions are constitutional," asserting this is an "improper[] inver[sion]" of "the customary burden on plaintiffs to establish their entitlement to a preliminary injunction and the general *presumption of constitutionality* that attaches to federal statutes."  Brief for Appellees ("Defs.' Br.") at 21 (emphasis added).  That is not even close to what *Bruen* says.  Rather, the Supreme Court clearly explained that, "[w]hen the Second Amendment's plain text covers an individual's conduct, the Constitution *presumptively protects* that conduct.  The government *must* then justify

1

its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Only then* may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen* at 2129-30 (emphases added).

Here, Plaintiffs have met their "customary burden" (Defs.' Br. at 21), as the district court correctly recognized. *See* ROA.300 ("Plaintiffs have sufficiently shown that their conduct is covered by the Second Amendment."); ROA.301 n.17 (it "appears Plaintiffs are within 'the people' envisioned by the Second Amendment."); *see also* Opening Br. at 9-11 (collecting cases).[1]    Thus, the Challenged Provisions are presumptively <u>un</u>constitutional, and *conclusively* so unless Defendants can demonstrate a broad and enduring historical tradition of government treating law-abiding young adults' right to keep and bear arms more restrictively than their older counterparts, subjecting them to waiting periods to acquire constitutionally protected arms.

---

[1] Nor have Defendants disputed outright that Plaintiffs – young adults – are members of "the people." Defendants make passing references to Plaintiffs' textual protection only twice. *See* Defs.' Br. at 12 ("Even assuming the Second Amendment extends to 18-to-20-year-olds...."); *id.* at 17 (noting that "Plaintiffs primarily urge that 18-to-20-year-olds fall within the class of persons protected by the Second Amendment and therefore cannot be 'disarm[ed],'" but failing to deny the premise).

## 2. Defendants Fail to Explain Why Supreme Court Dicta Should Be Elevated over the Court's Express Holdings.

Defendants' misunderstanding of the Supreme Court's precedents permeates their brief. For example, Defendants make the same error as the district court: that certain *dicta* plucked from various Supreme Court opinions somehow exempts the Challenged Provisions from the Court's *express holdings*. *See* Defs.' Br. at 12-22. But in accusing Plaintiffs of failing "to engage" with these *dicta* (*id.* at 20), Defendants project their own failures. First, Defendants reach the same erroneous conclusion as the district court, and simply talk past the voluminous discussion in Plaintiffs' Opening Brief explaining in detail why certain *dicta* about (i) "felons and the mentally ill," (ii) "conditions and qualifications on the commercial sale of arms," and (iii) "shall-issue" regimes do not exempt the Challenged Provisions from the *Bruen* framework. Opening Br. at 22-36. And second, Defendants leave unaddressed Plaintiffs' warning that treating the Supreme Court's passing aside to assumed traditions as conclusive without any further analysis provides no "limiting principle," because all manner of clearly unconstitutional laws could be justified simply by claiming they fall into some undefined category of *dicta*. *See id.* at 25, 28-29.

3

### 3. Defendants Repeatedly Misconstrue the Supreme Court's Statements.

Rather than engaging with Plaintiffs' arguments as to why Supreme Court *dicta* cannot be elevated over express holdings, Defendants distort the Supreme Court's language, changing its meaning entirely. First, Defendants erroneously claim that *Bruen* "explained that requirements to 'undergo a background check' do not generally impair the exercise of Second Amendment rights." Defs.' Br. at 12 (citing *Bruen* at 2138 n.9). *Bruen* reached no such conclusion. Rather, the Court merely observed that "shall-issue" licensing regimes employing certain criteria "do not *necessarily* prevent" the exercise of Second Amendment rights. *Bruen* at 2138 n.9 (emphasis added). Moreover, the Court's statement was made with full recognition that virtually all states with licensing regimes *also* permit either constitutional carry or open carry *without a license*, and thus a background check (and any accompanying delay) is not a prerequisite to exercising the right to bear arms. *See* Opening Br. at 31-32; *Bruen* at 2123 n.1. In contrast, the Challenged Provisions do prevent the exercise of Second Amendment rights – the acquisition of "arms" for keeping and bearing – for an indeterminate (but

4

very real) period of time during which Plaintiffs must *wait* while the government confirms their eligibility.  *See* Opening Br. at 35.

Second, and relatedly, Defendants claim that the Supreme Court "has approved of" background checks and that the Court has "explained" that regimes employing such background checks "are permissible."  Defs.' Br. at 13, 14 (claiming the *Bruen* Court found "shall-issue" regimes "permissible").  But again, the *Bruen* Court said no such thing, as sanctioning such regimes would constitute an advisory opinion on a whole host of permitting issues that were not even peripheral to the one before the Court.  *See* Opening Br. at 32-33 (citing court that found Defendants' theory "just disingenuous").  Tellingly, Defendants rely on a *concurrence* by Justice Kavanaugh and Chief Justice Roberts which was not adopted by a majority of the Court.[2]  Defs.' Br. at 14.  Additionally, the shall-issue regimes mentioned in *Bruen* govern the *bearing* of arms that people already *keep*, while the Challenged Provisions prevent members of "the people" from even acquiring arms, a threshold step to *keeping* them.  Accepting Defendants' theory would mean concluding the

---

[2] Notably absent from this concurrence is any historical analysis of Founding-era carry licensing laws that the majority just *required* be conducted.  *See Bruen* at 2126.

Supreme Court has approved broadly of *all* firearm-related background checks despite the Court never having heard a single background-check challenge.

Third, Defendants posit that the Second Amendment right "belong[s] only to 'law-abiding, responsible[3] citizens.'" Defs.' Br. at 13. The Third Circuit flatly rejected this claim. *Range v. Att'y Gen.*, 69 F.4th 96, 102 (3d Cir. 2023) ("the Supreme Court's references to 'law-abiding, responsible citizens' do not mean that every American who gets a traffic ticket is no longer among 'the people' protected by the Second Amendment."). So have several judges of this Court, even prior to *Bruen*. *NRA v. BATFE*, 714 F.3d 334, 335 (5th Cir. 2013) (Jones, J., dissenting) ("*NRA II*"). Indeed, the Supreme Court has never construed "the people" so narrowly. *See District of Columbia v. Heller*, 554 U.S. 570, 580 (2008) (emphasis added) (observing that "the term unambiguously refers to *all members of the political community*, not an unspecified subset"). Moreover, then-Judge Barrett expressed that the historical tradition does not support even the Second Amendment dispossession of *all* felons

---

[3] *Cf. Bruen* at 2123 (rejecting the notion that the government can use a "perceived lack of … suitability" as a justification to deny Second Amendment rights)

– but at most just the ones "who *are dangerous*." *Kanter v. Barr*, 919 F.3d 437, 451 (7th Cir. 2019) (Barrett, J., dissenting) (emphasis original).[4] And other Justices have expressed skepticism at construing "law-abiding" to effect broad disarmament.[5]

Fourth, Defendants suggest that the *Heller* Court "has provided" a number of regulations (which were not at issue in *Heller*) "that comport with the right to bear arms," going so far as to claim the Court "approved" them. Defs.' Br. at 13, 14. On the contrary, the *Heller* Court merely *presumed* certain regulations might be constitutional *if challenged*, based on an *assumed* historical tradition that would be "expound[ed] … if and when those exceptions come before us." *Heller*, 554 U.S. at 635; *see also id.* at 626 (admitting "we do not undertake an exhaustive historical analysis today of the full scope"). As Plaintiffs explained, assumptions can be wrong, no matter how fairly made, as evidenced by the slew of successful challenges against the very prohibitions the Supreme Court theorized might withstand review. *See* Opening Br. at 38 (collecting

---

[4] Below, Defendants argued that young adults aged 18-20 are somehow more dangerous and irresponsible as a class, and therefore can be disarmed. ROA.218. Defendants have not repeated that argument on appeal.

[5] Transcript of Oral Argument at 5-8, *United States v. Rahimi*, No. 22-915 (Nov. 7, 2023), http://tinyurl.com/yc3vrnbn (Justices Roberts and Thomas).

cases). Indeed, without the benefit of the rigorous historical analysis *Bruen* demands, it is difficult to say whether *any* given firearm regulation comports with the original public understanding of the Second Amendment.

## B. Defendants Minimize the Waiting Periods the Challenged Provisions Impose.

Defendants repeatedly claim that Plaintiffs enjoy no right to purchase a firearm "instantaneously," Defs.' Br. at 9, 12, 13, 18, apparently forgetting that the system designed to administer the Brady Act was entitled the National *Instant* Criminal Background Check System ("NICS").[6] Opening Br. at 2. For young adults, the Challenged Provisions make the system anything but instant.[7] Unsurprisingly, Defendants do not point to any other enumerated constitutional right whose exercise is delayed pending government verification that the person is entitled to exercise it.

---

[6] *See* 139 Cong. Rec. 30567-613 (evincing legislative intent against waiting periods).

[7] Defendants explain that this inherent delay in conducting an "enhanced background check" can take up to "10 business days...." Defs.' Br. at 21. Indeed, weekends and holidays add to the delay. For example, a person attempting to buy a gun on December 15, 2023 could be required to wait until January 2, 2024 (18 days). Of course, if the dealer is not open on the transfer date, or the buyer's work schedule is inflexible, the delay can extend even further. And, as Plaintiffs explained, background checks time out 30 days from initiation. Opening Br. at 3 n.2.

Irrespective of Defendants' focus on the fact that NICS must "immediately contact" state authorities,[8] the Challenged Provisions do not (and cannot) provide a correlated timeframe for state action, thus creating *inherent* delays that adults 21 and older do not suffer. *See Printz v. United States*, 521 U.S. 898, 935 (1997). By demurring that "the Act is not a 'waiting period' provision, it is a background-check measure," Defendants make a distinction without a difference. Defs.' Br. at 18. *Contra id.* at 31, 1, 20 ("requir[ing] such individuals to *wait*" while "the background check remains pending" for "the *time period* provided under the Act"). Following Defendants' logic, if there is no right to acquire a firearm without waiting potentially weeks for government approval, then the government might delay the exercise of other rights, too.[9] *See Bruen* at 2156 ("The [Second Amendment] is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'").

Defendants promise that the Challenged Provisions merely are "designed to ensure" that only law-abiding citizens receive firearms.

---

[8] Defs.' Br. at 5, 14, 15, 17.

[9] *But see Elrod v. Burns*, 427 U.S. 347, 373 (1976) (providing that the loss of constitutional "freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury").

Defs.' Br. at 12.  But *other* provisions of federal law (not the Challenged Provisions) bar certain categories of persons from acquiring arms.  There remains a qualitative difference between prohibiting *certain* adults from receiving firearms and restricting *all* young adults from receiving them until the government determines bona fides.  *See* Opening Br. at 25 n.9 (recounting Fourth Circuit Judge Richardson's statement that "round[ing] up everybody" to prevent crime, even "law-abiding citizens," undoubtedly would be "an infringement of the Fourth Amendment").

Indeed, the system the Challenged Provisions establish *is* "abusive," Defs.' Br. at 15, punishing law-abiding Plaintiffs with unavoidable delays by virtue of their age alone.  Defendants attempt to minimize these delays by insisting that the Challenged Provisions *only* deprive Plaintiffs' rights for "at most 10 business days," as if the Constitution does not apply on holidays and weekends.  *Id.* at 11.  But delays of "business days" quickly turn into delays of *weeks* or *months*.  *See* ROA.10 (identifying a member of Plaintiff GOA who "waited 18 days before finally being [approved] by the FBI …"); ROA.298 (noting Plaintiff Flores "had still not received her firearm" by August 2023).

If advocating the on-demand exercise of enumerated rights is an extreme position to take, Plaintiffs take it gladly. It seems highly unlikely that the colonists would have permitted a system where a rider on a galloping horse yells "the British are coming!" and the local gunsmith demurs "you know there's a 10-business-day waiting period for this musket, right?" Times may have changed since the Revolutionary War, but the need for immediate access to firearms has not. Young adults in particular, who only recently have come of age, are less likely than other adults to already possess the tools with which to defend themselves. Unfortunately, some persons will not have time to wait for the Challenged Provisions to run their course, as waiting periods have proved fatal.[10]

## C. Defendants Insist on Applying Repudiated Interest Balancing Throughout Their Brief.

In addition to failing to engage with Plaintiffs' arguments, misconstruing the Supreme Court's precedents, and minimizing the

---

[10] *See, e.g.*, P. Chiaramonte, *'No One Helped Her': NJ Woman Murdered by Ex While Awaiting Gun Permit*, Fox News, http://tinyurl.com/5d5sc2wu (Jan. 12, 2017); ROA.28 ¶57 (woman and children murdered during two-day waiting period); *cf.* J. Bonnett, *Police: Patterson Woman Fatally Shoots Intoxicated Man Trying to Break into Home*, CBS News (Sept. 25, 2022), http://tinyurl.com/22r64kpx ("retrieved a revolver from the upstairs bedroom – which she had acquired only one-day prior – and in self-defense of her husband, fired all rounds").

Challenged Provisions' waiting periods, Defendants also thumb their noses at *Bruen*, repeatedly inviting this Court to engage in the very interest balancing that *Heller* and *Bruen* rejected.

At the outset, Defendants claim that the FBI has "denied more than 200 firearms transfers solely as a result of" the Challenged Provisions. Defs.' Br. at 6, 32. The analytical irrelevance of ostensible "public safety" considerations aside,[10] Defendants offer this purported evidence in the form of a "Fact Sheet" fraught with political language yet devoid of corroborating data. *Id.* at 6. Indeed, absent is any information on the reasons for denial, whether the determinations were accurate, how many of the individuals actually "are dangerous," or whether any of these denials stopped any crimes. Because the FBI acknowledges its denials are erroneous at least "27.7 percent of the time," ROA.13, Defendants' denial statistic is unreliable and irrelevant .[11]

---

[10] *McDonald v. City of Chicago*, 561 U.S. 742, 783 (2010) ("The right to keep and bear arms … is not the only constitutional right that has controversial public safety implications.").

[11] *See also* J. Lott, *In Second District Race, a Real Difference in How to Battle Terror*, StarTribune (Sept. 29, 2016), http://tinyurl.com/mtkxj7de ("More than 2.4 million people have been denied gun purchases because of checks, but about 99 percent of those people are actually law-abiding citizens who happen to have similar names to the individuals we actually want to stop.").

Next, Defendants claim that the Challenged Provisions are an "essential means" for the government to ensure lawful gun ownership and, as such, are "reasonable regulatory measures." Defs.' Br. at 23. But the Supreme Court has long rejected consideration of the government's professed 'necessity' in infringing Second Amendment rights. *Bruen* at 2127 ("*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context."). Indeed, it does not matter how "important" or even "compelling" the government's "interest" is, nor how "reasonably" the measures are tailored to serve that interest. Because "[t]he Second Amendment 'is the very *product* of an interest balancing by the people,'" it is "this balance ... that demands our unqualified deference." *Id.* at 2131.

Defendants continue by claiming Plaintiffs have not shown that the Challenged Provisions' waiting periods are "*so severely lengthy* as to facially infringe the Second Amendment." Defs.' Br. at 9 (emphasis added); *see also id.* at 22 (emphasis added) (Plaintiffs "have not established the challenged provisions *meaningfully impair* their" rights). But Plaintiffs need not show a "severe" infringement, which is precisely the sort of goalpost-shifting charade that courts employed post-*Heller*,

pre-*Bruen*, to allow all manner of restrictions our Founders never would have endorsed.  Indeed, *Bruen* prohibited the prior "burden conduct" inquiry that allowed courts to make unprincipled judgment calls. *Compare Young v. Hawaii*, 992 F.3d 765, 783 (9th Cir. 2021), *with Bruen* at 2129-30 ("When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.").

Similarly, Defendants' contention that the Challenged Provisions' waiting periods are not "'abusive' or 'exorbitant'" also invites impermissible interest balancing.  Defs.' Br. at 9.  On the contrary, once Plaintiffs establish protected persons, arms, and conduct, the degree of the infringement is completely irrelevant.  If the presumptive infringement is to survive, it must find support in early American tradition.  *Bruen* at 2130.  Accordingly, this Court should disregard all invitations to consider anything beyond the historical arguments that Defendants make.  *See, e.g.*, Defs.' Br. at 10, 23 ("an essential means"); *id.* ("an important means"); *id.* at 17 ("the challenged provisions do not 'disarm' anyone"); *id.* at 22 ("reasonable background-check measures").

14

Next, Defendants discount *Md. Shall Issue, Inc. v. Moore*, 86 F.4th 1038 (4th Cir. 2023), but note that, "[i]n any event, the Maryland law … was *far more restrictive* than the provisions at issue here" because the law created a waiting period of up to 37 days.  Defs.' Br. at 21 (emphasis added).  According to Defendants, then, there exists a magic number somewhere between 18 days – Hayden Haines' wait time, which Defendants claim is not "abusive"[12] – and 37 days, which they find distinguishable.  But Defendants' invitation to divine just when a law starts becoming unreasonable is exactly the sort of "judge-empowering 'interest-balancing inquiry'" that the Supreme Court rejected time and again.  *Heller*, 554 U.S. at 634; *see also Bruen* at 2129.

Finally, Defendants attempt to distinguish *Maryland Shall Issue* by noting that the Maryland law "'cut[] off' for up to 30 days an individual's ability to obtain a handgun from any source," whereas the Challenged Provisions "apply only to commercial sales."  Defs.' Br. at 21 (alteration in original).  But as the *Heller* Court recognized, this is "no answer," because the government has no authority to tell its citizens just *how* they may exercise their rights.  554 U.S. at 629; *see also id.* at 634

---

[12] ROA.10; Defs.' Br. at 9.

("The very enumeration of the right takes out of the hands of government
… the power to decide on a case-by-case basis whether the right is *really
worth* insisting upon.").

## II. Defendants Fail to Establish an Early American Tradition of Distinctly Similar Firearm Regulation.

No doubt, if there *was* a historical tradition to support the
Challenged Provisions, surely it would have been revealed in Defendants'
briefing, either below or here.  But Defendants have shown nothing to
justify the waiting period imposed by the Challenged Provisions, an
omission noticed by the district court.  ROA.300 ("the Government does
not cite to specific founding era restrictions").

At the outset, "felons and the mentally ill have existed throughout
American history."  Opening Br. at 27.  So too have young adults.[13]  Yet
Founding-era laws never "operate[d] by indiscriminately delaying the
firearm purchases of all law-abiding persons," let alone young adults, in
order to 'suss out' those who might be prohibited.  *Id.*  The absence of any
such tradition is dispositive.

---

[13] *See NRA II*, 714 F.3d at 342 (Jones, J., dissenting) ("The members of the first
Congress were ignorant of thermal heat imaging devices; with late teenage males,
they were familiar.").

Seeking to bridge this chasm, Defendants cite the societal ill of firearms falling into the wrong hands as the ostensible justification for the Challenged Provisions. Defs.' Br. at 22. No doubt, the Founders faced the same concerns. *See, e.g.*, *United States v. Rahimi*, 61 F.4th 443, 456 (5th Cir. 2023) (identifying early laws disarming, *inter alia*, "slaves[] and Native Americans"). Accordingly, because this case does not involve some uniquely modern, "'unprecedented societal concern[]' warranting a loosening of analogical stringency," Opening Br. at 28, Defendants cannot meet their burden with merely "relevantly similar" analogues. *Bruen* at 2132. Instead, the historical inquiry is "fairly straightforward" and Defendants must proffer "distinctly similar" historical evidence that addressed the historically persistent societal issue the same way as today – historical laws imposing on Founding-era young adults an eligibility-verification waiting period before acquiring firearms from gunsmiths. *Id.* at 2131.

Defendants have failed to evince such a tradition, because none ever existed. Although this Court could end its inquiry here, there are a multitude of analogical errors that bear emphasis in Defendants' lesser, purportedly "relevantly similar" analogues.

17

### A. Defendants' Purported Background-Check Analogues Fail to Support the Challenged Provisions.

#### 1. *Loyalty Oaths.*

Elsewhere in their brief, Defendants claim that the Challenged Provisions "do not 'disarm' anyone"[14] because the provisions "do not address firearm possession or use." Defs.' Br. at 17; *see also id.* at 9, 19 (denying that the Challenged Provisions "'prevent' the exercise of Second Amendment rights"). If that is the case – that the Challenged Provisions *are nothing like* statutes which disarm certain groups – then Defendants must admit that their proffered historical *analogues* providing for outright disarmament of certain groups are totally irrelevant here. And yet Defendants begin their historical survey offering analogues "disarming loyalists and those 'notoriously disaffected to the cause of America.'" *Id.* at 23. Mystifying as this choice may be in light of Defendants' conflicting statements, these purported analogues fail both *Bruen*'s "how" and "why" metrics of relevant similarity, which concern

---

[14] The Challenged Provisions prevent young adults from acquiring arms from dealers for the duration of this novel waiting period. Whether a law provides for firearm confiscation or the prevention of acquisition, the end result is the same – "the people" are without "arms," that is, "disarmed." Similarly, one can be "disenfranchised" without previously having cast a vote.

the mechanisms and motivations underlying historical laws.  *See Bruen* at 2133.

Defendants identify laws from 1775 Connecticut, 1776 Massachusetts and Rhode Island, and 1777 New Jersey, North Carolina, Pennsylvania, and Virginia that required men[15] to take a loyalty oath on pain of disarmament.  Defs.' Br. at 24.  These laws fail *both* the "how" and "why" of *Bruen*.

First, such loyalty laws employed an entirely different mechanism which did not require the subscription of oaths each and every time someone purchased a firearm from a gunsmith.  *See id.* (requiring men to go once "before a justice of the peace"); *cf.* Opening Br. at 42 ("Plaintiffs will be subject to the Challenged Provisions every time" they purchase from a dealer).[16]

---

[15] Even if these laws were relevant, Plaintiff Flores is a woman, and neither she nor the scores of young adult women Plaintiffs represent would have been subjected to these laws in the Founding era.

[16] Loyalty oaths are nothing like a background check, which does not rely on a person's statement (oath) and instead conducts its own investigation into one's bona fides.

19

Second, these laws did not impose any waiting period or condition at the point of *acquisition* of arms on oaths; instead, men had to swear an oath to keep arms they already possessed.[17]  *See* Defs.' Br. at 24.

Third, these laws were transient in nature and did not persist into American tradition.  Such wartime measures, enacted by a minority of states and forced upon the opposing side during or shortly after a conflict, have no bearing on the domestic carry of arms for self-defense during peacetime.  *See Bruen* at 2133 (cautioning that "courts should not 'uphold every modern law that remotely resembles a historical analogue,' because doing so 'risk[s] endorsing outliers that our ancestors would never have accepted'").  Rather, *Bruen* explained that "territorial restrictions deserve little weight because they were—consistent with the transitory nature of territorial government—short lived. Some were held unconstitutional shortly after passage. … Others did not survive a Territory's admission to the Union as a State."  *Id.* at 2155.  It is unlikely that Revolutionary War-era loyalty oaths were ever "subject to judicial scrutiny" explaining

---

[17] Although Defendants do not mention it, a 1756 Virginia statute "for disarming Papists" who refused to take a loyalty oath to the Crown exempted "necessary weapons … for the defense of his house or person...."  7 William Waller Hening, The Statutes at Large; a Collection of all the Laws of Virginia 35 (1820), http://tinyurl.com/2p9x49sx; *see also Bruen* at 2142 n.12 (making the same point).

"the basis of their perceived legality," and thus there is no "evidence explaining *why* these unprecedented prohibitions ... were understood to comport with the Second Amendment." *Id.* Indeed, the sort of oaths relied on by Defendants here repeatedly have been found to be unconstitutional. *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624 (1943); *Speiser v. Randall*, 357 U.S. 513 (1958). And clearly, such loyalty oaths did not survive ratification of the Constitution or the Second Amendment, whose text arguably abrogates such measures. *Bruen* at 2155 (certain laws that "did not survive ... admission to the Union as a State" were "passing regulatory efforts by not-yet-mature jurisdictions on the way to statehood," rather than "part of an enduring American tradition of state regulation").[18]

---

[18] Revolutionary loyalty laws also had an entirely different "why" – they were wartime exigencies designed to disarm potential enemy combatants (not felons or the mentally ill). *See id.*; *see also Bruen* at 2152 n.26 ("There is ... little indication that these military dictates were designed to align with the Constitution's usual application during times of peace."); *id.* at 2140 (rejecting the tradition of disarming "political opponents," which only made those who would later become Americans more "jealous of their arms"); *id.* at 2154 (rejecting "improvisations" of a "transitional and temporary [nature] ... which might not have been tolerated in a permanent setup"); *Schenck v. United States*, 249 U.S. 47, 51-52 (1919) (finding that certain otherwise-unconstitutional requirements might be justified by wartime exigencies).

**2. Defendants' Remaining Purported Analogues Are Similarly Unhelpful.**

Next, Defendants cite *Teixeira v. County of Alameda*, 873 F.3d 670, 685 (9th Cir. 2017), for the proposition – without proffering any actual historical laws – that there were "colonial-era restrictions on the transfer and sale of arms." Defs.' Br. at 25. First, neither Plaintiffs nor this Court are "obliged to sift the historical materials for evidence to sustain [Defendants'] statute. That is [Defendants'] burden." *Bruen* at 2150.[19] But *Teixeira* actually undermines Defendants' Challenged Provisions, acknowledging that the "emphasis of the colonial governments was on ensuring that the populace was *well armed*, not on restricting individual stocks of weapons." 873 F.3d at 685 (emphasis added). Moreover, the historical laws the *Teixeira* court *did* identify on that page all concerned restrictions on firearm sales to natives outside the colonies – in essence, restrictions on sales to foreigners and potential belligerents at the time – not restrictions on the acquisition of arms by members of "the people." *See id.*

---

[19] *See also* Defs.' Br. at 30 (shoehorning unidentified "history" recently argued in *Reese v. BATFE* before this Court).

Defendants' references to two gunpowder storage laws – one from 1651 Massachusetts and one from 1795 Pennsylvania – fare no better. Defs.' Br. at 25 and n.8. Failing both *Bruen*'s "how" and "why," these disaster-prevention laws were products of a time when rudimentary gunpowder (today classified as an explosive[20]) was volatile and hazardous, with poor storage conditions and careless handling risking terrible accidents that risked widespread explosive and fire damage to entire cities and towns.[21] In contrast, the smokeless powder used as a propellant in today's firearms has exponentially greater stability and poses no such risks.[22] 18 U.S.C. § 845(a)(4) (exempting smokeless powder from explosive storage requirements).[23] Clearly, these laws did not prevent firearm acquisition by potentially prohibited persons, they did

---

[20] *See Black Powder*, ATF, http://tinyurl.com/45xrva8j (Sept. 2, 2022).

[21] Matthew E. Thomas, Historic Powder Houses of New England: Arsenals of American Independence 16-17 (2013); *see also id.* at 16 ("Sunday worshippers were known to flee meetinghouses during lightning storms in the event that lightning might strike the building and ignite the hidden supply of gunpowder."); "An Act to Provide for the Storing and Safe Keeping of Gun Powder in the Town of Boston, and *to Prevent Damage from the Same*," 1801 Mass. Acts 507; 1806 Ky. Acts 122, § 3 ("gun powder which might in case of fire be dangerous"); 1811 N.J. Laws 300, § 1 (prohibiting powder manufacture "within a quarter of a mile from any town or village....").

[22] *See* NSSF, *What Happens When Ammo Burns? Sporting Ammunition and the Fire Fighter*, YouTube (Nov. 28, 2012), https://youtu.be/3SlOXowwC4c.

[23] *See ATF Explosives Industry Newsletter*, ATF, at 1 (June 2013), http://tinyurl.com/2p9dsxsh (identifying smokeless powder as components of "small arms ammunition").

not impose waiting periods on the acquisition of arms, and in any case, their historical necessity has since passed. Finally, Plaintiffs question whether just two examples proffered in a "*see, e.g.*," citation even establish a *tradition*, as the *Bruen* Court dispensed with greater numbers of sources as mere "outliers." *Bruen* at 2153, 2156.

Similarly, Defendants' citations to two barrel-inspection laws – 1805 Massachusetts and 1821 Maine, respectively – are wholly inapposite. Defs.' Br. at 26 and n.9. Rather than preventing firearm acquisition by anyone, these laws ensured the proper functioning of arms. *See, e.g.*, An Act to Provide for the Proof of Fire Arms Manufactured Within This Commonwealth, ch. 81, <u>Acts and Resolves of Massachusetts: 1804-1805</u>, at 111 (Mar. 8, 1805) (reflecting the concern that untested firearms "may be introduced into use which are unsafe and thereby the lives of the Citizens be exposed").[24] Moreover, rather than imposing a waiting period on the acquisition of arms, the Massachusetts law imposed quality standards on manufacturers and a penalty of $10 on the knowing purchase of an untested firearm. *Id.* § 3, at 112. Even if this law was remotely analogous to the Challenged Provisions, the

---

[24] http://tinyurl.com/bdzmhmyy.

Challenged Provisions do not provide for the payment of a nominal fine to bypass a background check. *See Heller*, 554 U.S. at 633-34 (comparing historical penalties to modern consequences is a valid consideration).

Finally, Defendants' reference to two sale-registry laws from 1881 Illinois and 1892 Washington, D.C. also fails. Defs.' Br. at 26 and n.10. Such passive maintenance of sale records by dealers did not deprive young adult purchasers of their rights to acquire commercial arms pending lengthy verification of their legal eligibility. *See id.* Indeed, these laws burdened the *sellers* of arms, not the buyers. But most importantly, such evidence *postdates the Civil War* and "cannot by itself establish an early American tradition." *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2259 (2020) (rejecting even 30-plus examples from the late 19th century as unable to establish a tradition that did not exist at the Founding).

## B. Defendants Evince No Founding-Era Restrictions on Young Adults' Second Amendment Rights.

After some throat-clearing, Defendants finally turn their attention to the *relevant* history – purported examples restricting firearm access by young adults. Defs.' Br. at 27. Unsurprisingly, Defendants relegate their discussion to a single paragraph concerning the common-law age of

majority.  *Id.* at 27-28.  Notably absent from this discussion is any claim that firearm restrictions attached to 18-to-20-year-olds.  On the contrary, "it is plainly evident that young adults had the same rights to keep and bear arms as their elder counterparts during the Ratification Era." ROA.125.  Indeed, the historical record is replete with evidence that young adults were *expected* (often *required*) to bear arms.  Opening Br. at 11-12, 17 n.5.  Without any semblance of a Founding-era tradition, the Challenged Provisions are not just presumptively unconstitutional, but conclusively so.  *Bruen* at 2130.

Sidestepping this glaring deficiency, Defendants immediately fast-forward to the mid-19th century, Defs.' Br. at 28, which is analytically irrelevant and can only serve as "mere confirmation of what … had already been established" at the Founding.  *Bruen* at 2137.  Of course, Defendants established nothing at the Founding that justifies the Challenged Provisions.  Nevertheless, Defendants point to a number of states that "expressly restrict[ed] the ability of persons under 21 to purchase or use particular firearms."  Defs.' Br. at 28.  First, Defendants cite an 1856 Alabama law that prohibited the provision of pistols to men

under age 21.[25]  *Id.*  At the outset, from this point onwards, Defendants

rely on post-Founding laws that regulated young adult access to *pistols*,[26]

which are *not at issue* under the Challenged Provisions.  Indeed, as young

adults, Plaintiffs cannot purchase pistols commercially until they reach

the age of 21.  18 U.S.C. § 922(b)(1).  Rather, the Challenged Provisions

impose waiting periods on Plaintiffs' acquisition of long guns like

shotguns.  *See* ROA.119.  Accordingly, Defendants' "pistol" analogues are

entirely irrelevant because they left unregulated the *long guns* at issue

here.

Compounding error, Defendants cite the panel opinion in *NRA v.*

*Bondi*, 61 F.4th 1317, 1327 (11th Cir.), *vacated, reh'g en banc granted*, 72

F.4th 1346 (11th Cir. 2023), for an alleged "flurry" of similar laws.  Defs.'

Br. at 29.  But *Bondi* committed a flagrant methodological error,

elevating novel laws arising *after Reconstruction* above the original

meaning of the Second Amendment.  *See* 61 F.4th at 1327 (citing laws

---

[25] *See* note 15, *supra*, for Plaintiffs' rebuttal of sexist laws.  In any case, this law would have violated the Fourteenth Amendment's Equal Protection Clause adopted just 12 years later.  Analogical metrics aside, such an unconstitutional "analogue" hardly can justify the Challenged Provisions today.

[26] *See, e.g.*, http://tinyurl.com/28zj9jva (1856 Tennessee); http://tinyurl.com/5n7bvaj6 (1875 Indiana); http://tinyurl.com/ycym8knc (1897 Texas); *see also* Defs.' Br. at 29 and n.13 (citing these laws).

"[b]etween the Fourteenth Amendment's ratification and the close of the nineteenth century"). *Contra Bruen* at 2137 ("But to the extent later history contradicts what the text says, the text controls."); *Espinoza*, 140 S. Ct. at 2258-59. And, having been vacated by the Eleventh Circuit, the *Bondi* panel opinion provides zero analytical value and cannot even be called 'persuasive authority.'

Defendants follow with an 1875 Indiana law, also banning the provision of pistols to persons under age 21, before string-citing "[s]imilar" laws from 17 jurisdictions, ranging from 1856 to 1897. Defs.' Br. at 29 and n.13. Despite belonging to an irrelevant time period, as noted, by 1897 there were 45 states in the Union,[27] so Defendants' collection represents *less than half the country* at the time – hardly a representative "tradition." *Bruen* at 2133 (requiring "well-established and representative" history).

Defendants conclude by referencing "the sole 19th century judicial decision addressing [and upholding] these prohibitions," *State v. Callicutt*, 69 Tenn. 714, 716-17 (1878). Defs.' Br. at 30. But again,

---

[27] *Admission of States to the Union: A Historical Reference Guide*, <u>Cong. Rsch. Serv.</u> 4 tbl.1, <u>http://tinyurl.com/5xr5av72</u> (Dec. 5, 2023).

Defendants double down on "the sale of pistols," which are not even at issue in this case. *Id.* And contrary to Defendants' reliance on *Bondi*'s claim that the absence of legal challenge evidences constitutionality (Defs.' Br. at 30), *Bruen* was not so sure. *Bruen* at 2155 ("because these … laws were rarely subject to judicial scrutiny, we do not know the basis of their perceived legality").

All told, Defendants' historical analogues are too few, too late, and too irrelevant. The Founders never delayed young adults' access to long guns pending verification of their eligibility to own them. Such a practice was foreign to the Second Amendment then, so it is odious to the Second Amendment now. Failing to demonstrate an early American tradition of imposing eligibility-verification waiting periods on young adults' firearm purchases – or anything close – Defendants discredit their reliance on inapposite *dicta* as a replacement for the *Bruen* framework. Indeed, when the Court discussed certain "presumptively lawful regulatory measures," *Heller*, 554 U.S. at 627 n.26, it did so believing that the historical tradition would bear out its assumption. The fact that no such historical tradition exists here indicates that the Challenged Provisions are not the sort of "regulatory measures" the Court envisioned.

## III. Defendants Fail to Engage with Plaintiffs' Continuing Irreparable Harms.

Defendants dispute that Plaintiffs suffer *ongoing* irreparable harm, claiming the harms befalling Plaintiffs McRorey and Flores have "long passed." Defs.' Br. at 32. Tellingly, Defendants do not appear to dispute that a waiting period to exercise Second Amendment rights constitutes irreparable harm[28] – just that these two Plaintiffs are not *currently* waiting for the government to act. *See id.* at 31-32; *id.* at 32 (characterizing Plaintiffs' assertions that "they will again 'attempt to purchase firearms before reaching the age of 21'" as "some day intentions"). Again, Defendants fail to engage with Plaintiffs' arguments, ignoring Plaintiff McRorey's *already* "again" purchased a firearm (ROA.262), the harm to GOA member Hayden Haines who had to wait 18 days to get his gun (ROA.97), Plaintiff Flores who, as of August 2023, still had not received her firearm (ROA.298), and the "thousands" of young adult GOA and GOF members and supporters who continually purchase firearms and "are being and will continue to be irreparably harmed by the Challenged Provisions" (ROA.10) irrespective of Plaintiffs

---

[28] Nor can they. *Elrod*, 427 U.S. at 373 ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Bruen* at 2156 (warning that the Second Amendment "is not 'a second-class right'").

McRorey and Flores.  Defendants' attempts at narrowing the issue aside,
Plaintiffs (and the thousands of young adults they represent) suffer
irreparable harm every day the Challenged Provisions remain in effect.
Under Defendants' theory of harm, no one could obtain injunctive relief
against the Challenged Provisions.  But no legal authority requires
weekly updates as to the irreparable harm that continues to befall
thousands.

## IV.   Defendants' Attempt to Dispense with the Equitable Factors Falls Flat.

Because the equitable factors merge against governmental parties,
*Nken v. Holder*, 556 U.S. 418, 435 (2009), Defendants cannot shoehorn
interest balancing as a last-ditch attempt to save the Challenged
Provisions.  *See* Defs.' Br. at 32 (claiming "even if plaintiffs could
establish irreparable harm … any such harm does not outweigh the harm
to the government and the public").  Rather, if Plaintiffs suffer Second
Amendment harms, it "is always in the public interest to prevent the
violation of a party's constitutional rights."  *Jackson Women's Health
Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014).

In any case, Defendants suggest that enjoining the Challenged
Provisions would impair their ability to prevent prohibited persons from

purchasing firearms, "increasing the *likelihood*" that such persons "*might* misuse them." Defs.' Br. at 33 (emphases added). In contrast to this speculation layered upon speculation, Plaintiffs' harms are concrete, ongoing, and irreparable. Indeed, for a young adult unable to timely obtain a firearm because of the Challenged Provisions, the consequences could be catastrophic. It seems unlikely that an 18-year-old waitress, being stalked by a customer, will find consolation in the fact that she can acquire a firearm *weeks from now*.

## CONCLUSION

For the foregoing reasons, the Challenged Provisions violate the Second Amendment, and issuance of an injunction is necessary to prevent relegation of this nation's young adults to second-class status. The judgment of the district court should be reversed.

Respectfully submitted,

*/s/ Stephen D. Stamboulieh*

Robert J. Olson
WILLIAM J. OLSON, PC
370 Maple Ave. West, Suite 4
Vienna, VA 22180-5615
(703) 356-5070
wjo@mindspring.com

Stephen D. Stamboulieh
STAMBOULIEH LAW, PLLC
P.O. Box 428
Olive Branch, MS 38654
(601) 852-3440
stephen@sdslaw.us

Oliver M. Krawczyk
AMBLER LAW OFFICES, LLC
115 South Hanover Street, Suite 100
Carlisle, PA 17013
(717) 525-5822
oliver@amblerlawoffices.com                    *Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF SERVICE

I hereby certify that on January 8, 2024, I electronically filed the foregoing Reply Brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system, which will accomplish service on counsel for all parties through the Court's electronic filing system.

Dated: January 8, 2024

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,465 words, excluding the parts exempted by Fed. R. App. P. 32(f) and 5th Cir. R. 32.2.

This brief also complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5)-(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Century Schoolbook 14-point font.

Dated: January 8, 2024

*/s/ Stephen D. Stamboulieh*
Stephen D. Stamboulieh
*Counsel for Plaintiffs-Appellants*