# United States Court of Appeals for the Fifth Circuit

---

No. 23-10837

---

United States Court of Appeals
Fifth Circuit

**FILED**

April 26, 2024

Lyle W. Cayce
Clerk

ETHAN MCROREY; KAYLEE FLORES;
GUN OWNERS OF AMERICA, INCORPORATED;
GUN OWNERS FOUNDATION,

*Plaintiffs—Appellants*,

*versus*

MERRICK GARLAND, *U.S. Attorney General*;
FEDERAL BUREAU OF INVESTIGATION,

*Defendants—Appellees*.

---

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 7:23-CV-47

---

Before SMITH, HAYNES, and DOUGLAS, *Circuit Judges*.

JERRY E. SMITH, *Circuit Judge*:

Plaintiffs challenge provisions of the Bipartisan Safer Communities Act of 2022, contending that the government has failed to show an historical analogue for the Act's expanded background checks for 18-to-20-year-olds.

This case presents the latest rendition of the question we face during

No. 23-10837

the *Bruen-Rahimi*[1] interregnum:  What part of *Bruen* controls our evaluation of a firearm regulation?  Its imposition of an historical showing to be made by the government?  Or its various assurances that it did not disturb commonplace regulations in shall-issue regimes?

In this case, it is the latter.  Therefore, we affirm the denial of a preliminary injunction.

I.

Federal law limits to federally licensed entities the importing, manufacturing, and dealing of firearms.  *See* 18 U.S.C. § 923.  It also limits possession of firearms.  Specifically, § 922 purports to bar, from possession of firearms, categories of persons including felons, fugitives, drug addicts, individuals with mental illness, illegal aliens, dishonorably discharged members of the armed forces, and domestic abusers.  *See id.* § 922(g).[2]  Further, § 922(d) criminalizes the sale of a firearm to such a person.

In 1993, Congress instructed the Attorney General to create a system of national background checks.[3]  Under that law, the Attorney General established the National Instant Criminal Background Check System ("NICS").

---

[1] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022); *United States v. Rahimi*, 61 F.4th 443 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023).

[2] In the wake of *Bruen*, we have held some of those provisions unenforceable (at least in part) and have suspended judgment on at least one more. *See, e.g.*, *United States v. Daniels*, 77 F.4th 337, 354–55 (5th Cir. 2023) (reversing a conviction under § 922(g)(3)); *Rahimi*, 61 F.4th at 460–61 (reversing a conviction under § 922(g)(8)); *see also, e.g.*, *United States v. Reyna*, No. 23-40134, 2024 U.S. App. LEXIS 3005, at *3-4 (5th Cir. Feb. 8, 2024) (per curiam) (unpublished) ("This court consistently held § 922(g)(1) to be constitutional before *Bruen*, and we have not reconsidered the issue in a properly preserved challenge from a district court.").

[3] *See* Brady Handgun Violence Prevention Act (Brady Act), Pub. L. No. 103-159, § 103, 107 Stat. 1536 (1993) (*codified at* 18 U.S.C. § 922(t)).

No. 23-10837

*See* 28 C.F.R. § 25.1–11. NICS is administered by the FBI. *See id.* § 25.3.

Under that system, a federally licensed dealer must acquire identifying information from the purchaser and submit it to NICS before the dealer may sell the firearm. *See* 28 C.F.R. § 25.7(a); 27 C.F.R. § 478.124(c)(1). In turn, NICS queries three databases for matching records, 28 C.F.R. § 25.6 (c)(1), (f):

(1) National Crime Information Center ("NCIC"): "the nationwide computerized information system of criminal justice data established by the FBI as a service to local, state, and Federal criminal justice agencies," 28 C.F.R. § 25.2;

(2) Interstate Identification Index: "the cooperative federal-state system for the exchange of criminal history records," 28 C.F.R. § 20.3(m); and

(3) NICS Index: "the database, to be managed by the FBI, containing information provided by Federal and state agencies about persons prohibited under Federal law from receiving or possessing a firearm," 28 C.F.R. § 25.2.

NICS may respond to a licensee with "Proceed"—greenlighting the sale, or "Denied"—indicating that the licensee must deny it. 28 C.F.R. § 25.6(c)-(1)(iv)(A), (C). Alternatively, it can respond with "Delayed." *Id.* § 25.6(c)-(1)(iv)(B). "Delayed" tells the licensee that further investigation is needed, so he or she must wait for a follow-up, or for three business days to pass, whichever comes first. *See id.* Between November 30, 1998, and October 31, 2023, this process resulted in over 2.2 million denied purchases.[4]

_____

[4] *See* FBI, Federal Denials, https://perma.cc/B4BC-LBLG.

No. 23-10837

As relevant here, the Act, as amended in 2022,[5] bars the transfer of a firearm to a person below the age of 21 (this case involves those who are ages 18–20) unless—in addition to the above—

(1)    NICS has provided the licensed dealer with a unique identification number, and

(2)    3 business days have elapsed and NICS has not notified the licensee of cause for further investigation for disqualification of the applicant, or,

(3)    where there has been such a notification, 10 business days have passed, and NICS has not notified the licensee that transferring the firearm would be unlawful.[6]

In tandem with those provisions, the act also outlines NICS's responsibilities for the transfer to an applicant who is 18–20 years old. Beyond the requirements above, NICS must immediately contact three additional entities:

(1)    "the criminal history repository or juvenile justice information system, as appropriate, of the State in which the person resides,"

(2)    "the appropriate State custodian of mental health adjudication records in the State in which the person resides," and

(3)    "a local law enforcement agency of the jurisdiction in which the person resides . . . ."[7]

NICS must then respond to the dealer "as soon as possible, but in no case

---

[5] Pub. L. No. 117-159, 136 Stat. 1313 (2022).

[6] *See id.* § 12001(a)(1)(B)(i)(III) (codified at 18 U.S.C. § 922(t)(1)(C)).

[7] *Id.* § 12001(a)(2) (codified at 34 U.S.C. § 40901(*l*)(1)).

No. 23-10837

more than 3 business days."[8] The expanded provisions have resulted in more than 200 denials.[9]

According to plaintiffs, there are several logistical problems with this system: State and local authorities are not required to respond to a NICS inquiry; transferring a firearm without an "approval" from NICS violates the policies of many federal firearms licensees such as Walmart; actual wait times have varied, often well in excess of even the 10-day maximum; and the ATF also considers NICS checks valid for only 30 calendar days from when NICS is contacted, 27 C.F.R. § 478.102(c), so any substantial delay would possibly cause the background-check process to restart.

On May 12, 2023, Ethan McRorey (then age twenty) and Kaylee Flores (then nineteen) attempted to purchase shotguns from federally licensed dealers in Texas. They were informed that their purchases were being delayed because of the NICS protocols. Instead of waiting up to 10 business days, McRorey and Flores—joined by Gun Owners of America, Inc., and Gun Owners Foundation—sued that same day, requesting a preliminary injunction.

McRorey's purchase was approved five days later. Flores's purchase was allowed to proceed by virtue of hitting the 10-business day cap on May 27. Two and a half months after both individual plaintiffs could have acquired their shotguns under the challenged law, the district court denied their requested preliminary relief. The court reasoned that, though 18-to-20-year-old adults were protected by the Second Amendment, laws barring the mentally ill and felons from possessing firearms are constitutional, and re-

---

[8] *Id.* § 12001(a)(2) (codified at 34 U.S.C. § 40901(*l*)(2)).

[9] *See* Dep't of Just., Fact Sheet: Update on Justice Department's Ongoing Efforts to Tackle Gun Violence (2023), https://perma.cc/W8H2-ZJLT.

No. 23-10837

strictions to further those ends are presumptively lawful. Because this law falls into that category, plaintiffs lack a substantial likelihood of success on the merits and thus are not entitled to preliminary relief.

## II.

Plaintiffs appeal under 28 U.S.C. § 1292(a)(1). We review for abuse of discretion. *See Moore v. Brown*, 868 F.3d 398, 402 (5th Cir. 2017) (per curiam).

> In order to obtain a preliminary injunction, a movant must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction does not issue; (3) that the threatened injury outweighs any harm that will result if the injunction is granted; and (4) that the grant of an injunction is in the public interest. Factual findings are reviewed for clear error, while legal conclusions are reviewed de novo.

*Id.* (cleaned up). Because plaintiffs fail to demonstrate (1), we do not address (2)–(4).

## III.

*Bruen* and *Heller* make clear that background checks preceding firearm sales are presumptively constitutional.[10] Plaintiffs fail to rebut that presumption. Instead, by reading one passage of *Bruen* out of context, they ask us to invert it. We decline to do so because that is not a fair reading of *Bruen*—particularly in light of *Heller*.

## A.

Plaintiffs cleave to the following language in *Bruen*:

---

[10] *See Bruen*, 597 U.S. at 38 n.9; *District of Columbia v. Heller*, 554 U.S. 570, 626–27 (2008).

No. 23-10837

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 24 (citation omitted). Plaintiffs read that language to say that *the government* must show "a broad and enduring historical tradition" analogous to the challenged provisions in this case. In a vacuum, plaintiffs' reading is tenable.

But we do not read that language in a vacuum. In *Heller*, the Court described "conditions and qualifications on the commercial sale of arms" as "presumptively lawful." 554 U.S. at 626–27 & n.26. *Bruen* did nothing to disturb that part of *Heller*.[11] Instead, *Bruen* continued to distinguish the treatment of prohibitions on "keep[ing] and bear[ing]"—such as the law at issue in *Bruen*—and other ancillary firearm regulations such as background checks preceding sale:

> To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' "shall-issue" licensing regimes, under which a general desire for self-defense is sufficient to obtain a permit. Because these licensing regimes do not require applicants to show an atypical need for armed self-defense, they do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right to public carry. Rather, it appears that these shall-issue regimes, which often require applicants to undergo a back-

---

[11] It is quite possible that *Bruen* disturbed *no part* of *Heller*. *See, e.g., Bruen*, 597 U.S. at 39 (purporting to apply "*Heller*'s text-and-history standard."); *id.* at 72 (Alito, J., concurring) ("Nor have we disturbed anything that we said in *Heller* . . . .").

No. 23-10837

> ground check or pass a firearms safety course, are designed to
> ensure only that those bearing arms in the jurisdiction are, in
> fact, law-abiding, responsible citizens. And they likewise ap-
> pear to contain only narrow, objective, and definite standards
> guiding licensing officials, rather than requiring the appraisal of
> facts, the exercise of judgment, and the formation of an
> opinion—features that typify proper-cause standards like New
> York's. That said, because any permitting scheme can be put
> toward abusive ends, we do not rule out constitutional chal-
> lenges to shall-issue regimes where, for example, lengthy wait
> times in processing license applications or exorbitant fees deny
> ordinary citizens their right to public carry.

*Bruen*, 597 U.S. at 38 n.9 (alterations accepted and internal citations and quo-
tation marks omitted). One of the concurrences was even more explicit:
"[S]hall-issue licensing regimes are constitutionally permissible, subject of
course to an as-applied challenge if a shall-issue licensing regime does not
operate in that manner in practice." *Bruen*, 597 U.S. at 80 (Kavanaugh, J.,
concurring, joined by Roberts, C.J.) (citation omitted).[12]

Read against the background provided by *Heller*, *Bruen*'s footnote 9
plainly forecloses plaintiffs' contention. *Bruen* "should [not] be interpreted
to suggest the unconstitutionality of . . . regimes, which often require appli-
cants to undergo a background check" because such checks "are designed to
ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abid-
ing, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*,
554 U.S. at 635). Such regimes "contain only narrow, objective, and definite
standards guiding licensing officials, rather than requiring the appraisal of

---

[12] At least the Tenth Circuit, without any apparent controversy, has interpreted
this to mean that "*Bruen* apparently approved the constitutionality of regulations requiring
criminal background checks before applicants could get gun permits." *Vincent v. Garland*,
80 F.4th 1197, 1201 (10th Cir. 2023).

facts, the exercise of judgment, and the formation of an opinion." *Id.* (internal quotation marks and citations omitted). Even so, such regimes might be unconstitutional where it is "put toward abusive ends," *e.g.*, by imposing "lengthy wait times." *Id.* But, without such a showing here, plaintiffs struggle to get around that language.

Even so, plaintiffs make a valiant effort. They characterize passages such as footnote 9 as *dicta*. We, however, "are generally bound by Supreme Court dicta, especially when it is recent and detailed." *Hollis v. Lynch*, 827 F.3d 436, 448 (5th Cir. 2016) (internal quotation marks and citation omitted). And it doesn't get more recent or detailed than *Bruen*.

Perhaps recognizing this, plaintiffs characterize those "dicta" as conflicting with express holdings and assert that "[d]icta cannot supplant express holdings." That is true.

But, in rejecting plaintiffs proposed approach, we do not supplant any holding. *Bruen* requires an historical showing by the government "[w]hen the Second Amendment's *plain text* covers an individual's conduct." 597 U.S. at 24 (emphasis added). The plain text covers plaintiffs' right "to keep and bear arms." U.S. Const. amend. II. And on its face "keep and bear" does not include purchase—let alone without background check.[13] That is so in either the contemporary[14] or the Founding-era context.[15]

---

[13] On the other hand, the government's argument that 18-to-20-year-olds are excluded from the Second Amendment's ambit is properly evaluated only under *Bruen*'s historical approach. We leave the merits of that contention for another day.

[14] *See, e.g.*, *Keep*, Oxford Dictionaries, https://tinyurl.com/2s46df8s (last visited April 8, 2024) ("Have or retain possession of[.]"); *Bear*, Oxford Dictionaries, https://tinyurl.com/5bfmcjre (last visited April 8, 2024) ("(Of a person) carry (someone or something)[.]").

[15] *See generally Heller*, 554 U.S. 570 (failing to suggest a connection between "pur-

No. 23-10837

Plaintiffs' best response is that the Court applied the historical test to "sensitive place" restrictions when it noted that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place.'" *Bruen*, 597 U.S. at 31 (cleaned up). But we distinguish that apparent tension with *Heller*'s language about presumptive lawfulness in three ways.

First, sensitive-place laws are likely captured by the plain text of the Second Amendment—they directly impact the right to bear. Therefore, they are likely subject to *Bruen*'s historical analysis. Second, though *Heller* notes sensitive-place laws are presumptively lawful, *Bruen*'s footnote 9 omits them.[16] Third, even if sensitive-place laws are presumptively lawful, declaring all of Manhattan as a "sensitive place," seems like the quintessential example of putting a presumptively constitutional regulation "toward abusive ends." *Bruen*, 597 U.S. at 38 n.9.

The right to "keep and bear" can implicate the right to purchase. That is why the Court prohibits shoehorning restrictions on purchase into functional prohibitions on keeping. *See id.* But such an implication is not the same thing as being covered by the plain text of the amendment.

The law at issue in *Bruen* underscores this distinction. That statute prohibited public carry—conduct readily within the plain meaning of "keep and bear"—without demonstrated cause.[17] The challenged regulation here

---

chase" or related concepts and "keep and bear" despite extensive historical linguistic analyses by Justices Scalia and Stevens from radically different viewpoints).

[16] Thus, if anything, *Bruen* displaced *Heller*'s statement about the presumptive lawfulness of sensitive-place restrictions but not its statement about background checks. We make no holding in this regard.

[17] *Bruen*, 597 U.S. at 11 ("Because the State of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense, we conclude that the State's licensing regime violates the Constitution.").

No. 23-10837

is entirely dissimilar.[18]  Background checks such as those in the challenged provisions are presumptively lawful.

## IV.

We turn to whether plaintiffs have shown that these presumptively lawful regulations have been "put toward[s] abusive ends" or have otherwise rebutted that presumption. *Id.*

The government correctly points out that "[t]he background-check provisions that plaintiffs challenge here fit comfortably within the regulatory measures the Supreme Court has approved."  Indeed, background checks, especially when not at all lengthy, are perhaps the most frequently mentioned regulation characterized approvingly by the Supreme Court as something between "presumptively lawful," *Heller*, 554 U.S. at 627 n.26, and "constitutionally permissible," *Bruen*, 597 U.S. at 80 (Kavanaugh, J., concurring).

Even on the weaker end of that spectrum, plaintiffs have not rebutted the presumption of lawfulness.  But that is their burden at this early stage of the litigation.[19]

There is little risk of the one express concern the Court has voiced with respect to background checks—lengthiness.  *See id.* at 38 n.9.  The

---

[18] We have previously stated that "acquiring firearms to protect one's hearth and home" is a "core Second Amendment guarantee." *Bezet v. United States*, 714 F. App'x 336, 341 (5th Cir. 2017).  Our ruling today does not undermine that statement.  Even under our reading of *Bruen*, the Second Amendment extends protection to acquisition.  There is no question that regulations on purchase so burdensome that they act as *de facto* prohibitions on acquisition would be subject to constitutional challenge under *Bruen*'s rigorous historical requirement. *See Bruen*, 597 U.S. at 38 n.9 (discussing when permitting schemes are "put toward abusive ends.").  But that is not this case.

[19] All we now decide is that plaintiffs have not met the burden for a preliminary injunction.  Through further development of the record, they might end up showing that the challenged provisions have been put toward abusive ends.

government is right that, "by operation of law, the maximum duration a dealer must wait under the Act while a background check remains pending is . . . 10 business days." But plaintiffs contend that this restriction is *de facto* indefinite. They point to data in support of that proposition, including that, like Flores's, many waits extend much longer than 10 business days.

The problem with plaintiffs' use of this phenomenon is that it is not a requirement of the challenged law. Plaintiffs have not pointed to any provision of the law that requires dealers to wait more than 10 business days. That dealers choose to do so is a result of their own policy, as plaintiffs readily admit. But "a third party's 'legitimate discretion' breaks the chain of constitutional causation." *Turaani v. Wray*, 988 F.3d 313, 317 (6th Cir. 2021) (citation omitted).

Plaintiffs also aver that a 10-business-day wait is "abusive" and that, after all, it is not as though "the Constitution does not apply on holidays and weekends." In their words,

> It seems highly unlikely that the colonists would have permitted a system where a rider on a galloping horse yells "the British are coming!" and the local gunsmith demurs "you know there's a 10-business-day waiting period for this musket, right?"

Appellants' Reply Br. at 10. Though plaintiffs assert that the view we adopt today "contains no limiting principle," the problem of the limiting principle lies with the plaintiffs. Our law is plain as can be that some amount of time for background checks is permissible. But plaintiffs' reasoning requires that the checks be instant, and they do not shy away from that. *See* Appellants' Reply Br. at 11 ("Times may have changed since the Revolutionary War, but the need for *immediate* access to firearms has not." (Emphasis added)). That is not our law.

No. 23-10837

In short, there is some point at which a background check becomes so lengthy that it is "put towards abusive ends" or subject to *Bruen*'s historical framework as a *de facto* prohibition on possession. But a period of 10 days does not qualify.

AFFIRMED.